852 F.2d 1522
 26 Fed. R. Evid. Serv. 334
 UNITED STATES of America, Plaintiff-Appellee,
v.
Gary Lee YARBROUGH, Andrew Virgil Barnhill, Richard H. Kemp,
Ardie McBrearty, Randolph George Duey, David Eden Lane,
Bruce Carroll Pierce, Jean Margaret Craig, Frank Lee Silva,
Randall Paul Evans, Defendants-Appellants.
 Nos. 86-3024, 86-3025, 86-3026, 86-3027*,
86-3028, 86-3029, 86-3030, 86- 3033, 86-3034 and 86-3035.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted April 8, 1988.
Submitted on Briefs April 8, 1988*.
Decided July 6, 1988.
 
 Michael G. Parham, Ellijay, Ga., for defendant/appellant Ardie mCbrearty.
 Michael P. Ruark, Breskin & Robbins, Seattle, Wash., for defendant/appellant Bruce Carroll Pierce.
 David R. Chappel, Bellevue, Wash., for defendant/appellant Jean Margaret Craig.
 Brian Phillips, Everett, Wash., for defendant/appellant David Eden Lane.
 Anthony Savage, Seattle, Wash., for defendant/appellant Andrew Virgil Barnhill.
 Jeffrey M. Evans, Reno, Nev., for defendant/appellant Randall Paul Evans.
 Frederick D. Leatherman, Jr., Seattle, Wash., for defendant/appellant Randolph George Duey.
 James L. Vonasch, Seattle, Wash., for defendant/appellant Gary Lee Yarbrough.
 Steve Paul Moen, Shafer, Moen & Bryan, Seattle, Wash., for defendant/appellant Richard H. Kemp.
 James A. Trujillo, Trujillo, Peick & Smith, Bellevue, Wash., for defendant/appellant Frank Lee Silva.
 David E. Wilson, Asst. U.S. Atty., Seattle, Wash., Susan L. Barnes, Asst. U.S. Atty., Seattle, Wash., Peter O. Mueller, Asst. U.S. Atty., Seattle, Wash., Robert D. Ward, Sp. Asst. U.S. Atty., San Francisco, Cal., and Ronald Howen, Sp. Asst. U.S. Atty., Boise, Idaho, for plaintiff/appellee.
 Appeals from the United States District Court for the Western District of Washington.
 Before BEEZER, HALL and WIGGINS, Circuit Judges.
 WIGGINS, Circuit Judge:
 
 
 1
 The appellants were convicted of violating the federal racketeering laws (RICO) and conspiring to violate those laws. 18 U.S.C. Sec. 1962(c) & (d). On the RICO counts, all the appellants were sentenced to maximum twenty-year sentences for both the substantive and conspiracy convictions. These sentences are to run consecutively. Most of the appellants were also convicted of various other offenses including: armed robbery of armored cars and banks, 18 U.S.C. Sec. 1951 (Hobbs Act), transporting stolen property across state lines, 18 U.S.C. Sec. 2314, harboring fugitives, 18 U.S.C. Sec. 1071, and various federal firearms offenses, 26 U.S.C. Secs. 5861(d) & 5871. Most of the sentences for these crimes are to run consecutively. The appellants timely appealed alleging numerous errors. We AFFIRM.
 
 I.
 FACTS AND PROCEEDINGS BELOW
 
 2
 All the appellants were members of a radical right-wing, white-supremacist group known as the "Order" or the "Bruders Schweigen" (Silent Brothers). Over one hundred witnesses, including many members of the Order named in the indictment who had pled guilty, testified at trial. Their testimony established the following facts. In the fall of 1983, Robert Matthews conceived the idea of the Order. Matthews was convinced that the United States needed to be saved from the "perverting influence" of non-white, non-Christian people. He determined to create a group dedicated to overthrowing the United States government that he perceived to be dominated by Jews. He gathered together a group of like-minded individuals to establish the organization. This group included appellants Lane, Pierce, Duey and Kemp, among others. Each member had previously associated himself with various right-wing radical organizations such as the Ku Klux Klan, the National Alliance (a neo-Nazi organization), and the "Christian Identity" movement (a "Christian" group with extreme racist and anti-Semitic views).
 
 
 3
 The appellants decided that the "right-wing" struggle needed a group dedicated to direct action. Recognizing that the "struggle" required money, on October 28, 1983, the group engaged in its first crime--the armed robbery of an adult book store in Spokane, Washington. The robbery yielded little so the appellants tried other, presumably more lucrative, schemes. They engaged in counterfeiting, but on the arrest of Pierce for passing fake bills, they abandoned this idea. The appellants then decided to try their hand at armored car robbery.
 
 
 4
 In November, 1983, Matthews, Pierce, and Duey, among others, went to Seattle from Idaho to carry out such a robbery. The group meticulously planned the crime and their escape, but delayed execution of the robbery until March, 1984. In the interim, Matthews, Pierce, and Yarbrough robbed several banks to raise money for the Order. On March 16, 1984, Matthews, Pierce and Duey carried out their earlier plan to rob the armored car. They obtained $39,000 in that robbery. In April, 1984, Matthews, Pierce, Yarbrough, Duey, Kemp and Barnhill robbed the same armored car route and courier in Seattle. This time they obtained approximately $235,000 in cash and $300,000 in checks.
 
 
 5
 Matthews then came in contact with a sympathetic employee of the Brinks Armored Car Company. The contact supplied the Order with inside information about the routes, crews, and cargoes of Brinks armored car routes. Based on this information, on July 19, 1984, appellants Matthews, Pierce, Yarbrough, Duey, Barnhill, Kemp and Evans robbed Brinks' Ukiah, California armored car run. The robbery netted approximately $3,600,000 in cash. The participants in the robbery received as "salary" and "bonuses" $40,000 for their part in the crime. The rest of the money went into the coffers of the Order. Some of the money was "donated" to other right-wing groups.
 
 
 6
 During this time period, members of the Order also murdered two people. In May, 1984, Richard West, a potential member of the group, was murdered because he was believed to be a government agent. On June 18, 1984, a member of the group murdered Alan Berg, a Denver radio talk show host. Berg, a Jew, was an outspoken critic of right-wing groups in general and racist and anti-Semitic groups in particular. On his radio program, Berg had criticized several right-wing, racist organizations of which present or future members of the Order belonged. The Order decided that Berg should be killed for his criticism of the groups and to make a "statement" by killing a prominent Jewish person. Berg was machine-gunned by Pierce when stepping from his car to his driveway in front of his Denver home.
 
 
 7
 In October, 1984, law enforcement agencies began to close in on the Order. The group split up to avoid apprehension. On November 24, 1984, Yarbrough and Matthews were cornered in a Portland motel. Yarbrough was captured, but Matthews, though wounded, managed to escape. With the help of several members of the Order, he moved to Whidbey Island, Washington. On December 7, 1984, federal and state law enforcement agents tracked Matthews and other members of the group to the Island. Matthews burned to death when the house he occupied caught fire during a gun battle between himself and the agents. During the next several months, the rest of the appellants were captured.
 
 
 8
 The government indicted 23 defendants under the counts outlined above. Twelve pled guilty before trial. The jury found all the appellants guilty of the substantive RICO count and the conspiracy RICO count. Many of the defendants were also found guilty of the other substantive federal crimes.
 
 
 9
 The appellants allege numerous errors by the trial court requiring reversal or resentencing. We now set forth each of the appellants' arguments.
 
 
 10
 A. Pretrial Errors.
 
 
 11
 1. Appellants Kemp, Duey and Pierce argue that it was error for the trial court to deny their motion to strike allegations of the West murder charged in Count I of the indictment. These appellants argue that the murder allegations deprived them of their right to testify in their own defense because their testimony might later be used against them in state court homicide prosecutions.
 
 
 12
 2. Appellant Craig argues that Count I of the indictment was duplicitous.
 
 
 13
 3. Appellants Silva, Evans and McBrearty claim error in the trial court's denial of their motions for severance.
 
 
 14
 4. Appellant McBrearty claims that he was denied access to jury records in violation of 28 U.S.C. Sec. 1867(f).
 
 
 15
 5. Appellant Barnhill alleges error in the trial court's denial of his motion to suppress evidence seized from his house and a storage locker.
 
 
 16
 6. Appellant Lane claims error in the trial court's denial of his motion to suppress evidence seized in his habitation.
 
 
 17
 B. Trial Errors.
 
 
 18
 1. Appellants Yarbrough, Kemp, Duey, Pierce, Lane and Silva argue that coconspirator statements admitted at trial failed to meet the requirements of Fed.R.Evid. 801(d)(2)(E) as not "in furtherance" of a conspiracy. They also argue that their admission violated the confrontation clause of the sixth amendment.
 
 
 19
 2. Appellants Yarbrough, Kemp, Duey, Lane and Silva argue that admission of a codefendant's confession violated the "Bruton" rule.
 
 
 20
 3. Appellant McBrearty claims he was denied due process by the testimony of a coconspirator testifying pursuant to a plea agreement.
 
 
 21
 4. Appellant McBrearty claims he was denied due process because the prosecutor engaged in misconduct by improperly indicating his personal belief in the appellant's guilt.
 
 
 22
 5. Appellant Yarbrough argues that it was error for the trial court to deny his motion for a mistrial after several witnesses alluded to his prior incarceration.
 
 
 23
 6. Appellants Duey and Pierce allege there was insufficient evidence to convict them of conspiracy to rob an armored car.
 
 
 24
 7. Appellants Silva and Duey allege there was insufficient evidence to convict them of harboring a fugitive.
 
 
 25
 8. Appellant Evans claims there was insufficient evidence adduced at trial to prove that a pattern of racketeering activity was the means "through" which he participated in the RICO enterprise.
 
 
 26
 9. Appellant Evans claims that the judge's final RICO instructions to the jury allowed the jury to convict him solely on the basis of his beliefs in violation of his first amendment rights of advocacy and association.
 
 
 27
 10. Appellant Craig argues that the judge committed error by rejecting her offered instruction setting out her theory of the case.
 
 
 28
 C. Sentencing Errors.
 
 
 29
 1. Appellant McBrearty claims that he was denied access to his presentence report in violation of Fed.R.Crim.P. 32(c)(3).
 
 
 30
 2. Appellants Yarbrough, Evans, Duey, Pierce and McBrearty allege that the trial court's consecutive sentencing on the substantive RICO count and the conspiracy RICO count, as well as other counts, was error.
 
 
 31
 3. Appellants Pierce and Duey argue that the imposition of a 20-year consecutive sentence for their conviction of conspiracy to rob an armored car constitutes cruel and unusual punishment under the eighth amendment.
 
 II.
 DISCUSSION
 
 32
 A. Pretrial Errors.
 
 
 33
 1. West and Berg Murder Allegations.
 
 
 34
 Kemp, Duey and Pierce argue that it was error for the trial court to deny their motion to strike allegations of the Berg and West murders from Counts I and II (RICO counts) of the indictment. The indictment did not charge these appellants with murder, but the allegations were included as RICO predicate acts.[1] The appellants contend that the murder allegations deprived them of their fifth amendment right to testify in their own defense as to the RICO counts because their testimony might later be used against them in state court homicide prosecutions. To date, no such prosecutions have been brought against these appellants for either the West or Berg murders.[2]
 
 
 35
 Alleged constitutional errors require de novo review by the court of appeals. United States v. McConney, 728 F.2d 1195, 1201 (9th Cir.) (en banc), cert. denied, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984) (questions of law are reviewed de novo). In McGautha v. California, 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971), the Supreme Court examined the issue of whether the fifth amendment privilege to not testify was impermissibly burdened by a capital case procedure where the jury decided both guilt and punishment in a unified proceeding. The appellant claimed that he was precluded from testifying on the issue of sentencing because he opened himself up to cross-examination on issues of guilt. The Court rejected the appellant's fifth amendment due process claim because it found that such a unified system did not unlawfully compel the defendant to become a witness against himself. The Court noted:
 
 
 36
 The criminal process, like the rest of the legal system, is replete with situations requiring "the making of difficult judgments" as to which course to follow.... Although a defendant may have a right, even of constitutional dimensions, to follow whichever course he chooses, the Constitution does not by that token always forbid requiring him to choose. The threshold question is whether compelling the election impairs to an appreciable extent any of the policies behind the rights involved.
 
 
 37
 Id. at 213, 91 S.Ct. at 1470 (citation omitted). The appellants in the instant case were presented with a similar difficult choice. It did not, however, impermissibly impair any of the "policies" behind the fifth amendment.[3] The appellants can only speculatively point to some future state court homicide prosecution. They faced the typical situation of any federal defendant who might face related prosecution in state court.
 
 
 38
 In United States v. Nolan, 700 F.2d 479 (9th Cir.), cert. denied, 462 U.S. 1123, 103 S.Ct. 3095, 77 L.Ed.2d 1354 (1983), the court set out the test for determining whether joinder of charges prejudiced a defendant's fifth amendment rights. If the defendant can show that he had important testimony to give on some counts and a strong need to refrain from testifying on other counts, severance may be required. Id. at 483. Nolan dealt with a much more compelling presentation of the issue than the case at bar. The defendant was simultaneously charged in state court for murder and in federal court for firearm offenses dealing with the same weapon used in the murder. The court rejected the appellant's fifth amendment claim:
 
 
 39
 Although Nolan argues that his Fifth Amendment right was violated, the government never forced him to testify or in any way attempted to coerce his exercise of Fifth Amendment rights. Every time a defendant decides whether to testify, he must weigh the possibility that the testimony he gives may later be used against him....
 
 
 40
 In effect, Nolan asks this court to choose his strategic weapons without regard to the needs of the judicial system.
 
 
 41
 Id. at 483 (citation omitted). In the case at bar, the appellants were not forced or coerced into testifying. Their claim is much weaker than the appellant in Nolan, who concurrently faced a state court murder charge. The appellants only point to a possibility of future state court prosecution. That possibility did not warrant striking the murder predicate acts from the indictment.
 
 
 42
 2. Duplicitous Indictment.
 
 
 43
 Appellant Craig argues that Count I of the indictment improperly charged two offenses in paragraph 19 and is therefore duplicitous. She asserts that the duplicity denied her sixth amendment right to be informed of the nature and cause of the accusations against her. Appellate review of an indictment to determine if it is duplicitous is de novo. United States v. Aguilar, 756 F.2d 1418, 1421 (9th Cir.1985).
 
 
 44
 Paragraph 19 of the indictment contains two parts:
 
 
 45
 (a) On or about July 21, 1984, at Boise, Idaho, ... Jean Margaret Craig, ... did conceal, store, and dispose of stolen money in the amount of approximately $3.6 million dollars, which sum moved as and constituted interstate commerce, all knowing the same to have been stolen. All in violation of Title 18, United States Code, Secs. 2315 and 2.
 
 
 46
 (b) On or about July 21, 1984, at Boise, Idaho, and elsewhere, Jean Margaret Craig did receive, conceal, and store stolen money in the amount of approximately $10,000, which sum moved as and constituted interstate commerce, Jean Margaret Craig knowing the same to have been stolen. All in violation of Title 18, United States Code, Sec. 2315.[4]
 
 
 47
 Craig made a pretrial motion to compel the government to elect to proceed under subsection (a) or (b) or to dismiss the indictment. The trial court denied the motion. Near the end of the government's case-in-chief, the government moved to dismiss subsection (a). The trial court granted the government's motion and submitted the case to the jury only on section (b).
 
 
 48
 Review of an indictment for duplicity is limited:
 
 
 49
 In reviewing an indictment for duplicity, our task is not to review the evidence presented at trial to determine whether it would support charging several crimes rather than one, but rather solely to assess whether the indictment itself can be read to charge only one violation in each count.
 
 
 50
 United States v. Mastelotto, 717 F.2d 1238, 1244 (9th Cir.1983). On its face, paragraph 19 sets out two separate offenses--disposing of $3.6 million of the Ukiah armored car robbery proceeds and receiving $10,000 of that money. However, Craig is not "charged" with violations of 18 U.S.C. Secs. 2 and 2315. Rather, these charges simply constitute predicate RICO acts. Count I charges her with one federal crime--violation of the federal racketeering laws. The indictment, therefore, was not duplicitous as to Craig.
 
 
 51
 3. Severance.
 
 
 52
 Appellants Silva, Evans and McBrearty claim error in the trial court's denial of their pretrial motions for severance of their trials from the other defendants. See Fed.R.Crim.P. 14 (Relief from Prejudicial Joinder). None of these appellants renewed their severance motions at the close of the government's evidence. A motion for severance must be made both before trial and at the close of the prosecution's case-in-chief to preserve the issue on appeal. United States v. Burgess, 791 F.2d 676, 678 (9th Cir.1986) (severance of charges); United States v. Monks, 774 F.2d 945, 949 (9th Cir.1985) (severance of defendants); United States v. Guess, 745 F.2d 1286, 1289 (9th Cir.1984), cert. denied, 469 U.S. 1225, 105 S.Ct. 1219, 84 L.Ed.2d 360 (1985) (severance of charges). Otherwise, the motion is considered waived on appeal. We hold that the appellants are precluded from raising the severance issue on appeal.
 
 
 53
 4. Motions to Suppress.
 
 
 54
 (a). Barnhill.
 
 
 55
 Appellant Barnhill argues that the trial court erred in denying his pretrial motion to suppress evidence seized pursuant to several search warrants. He argues that the affidavits in support of the search warrants did not supply sufficient probable cause to believe that evidence of Barnhill's participation in the Order's crimes would be found. An appellate court reviews a magistrate's decision to issue a search warrant only to determine if there was a "substantial basis" for concluding that the evidence sought will be found in the place described by the affidavit. Illinois v. Gates, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983); United States v. Jackson, 756 F.2d 703, 705 (9th Cir.1985). The scope of review of the appellate court is limited. United States v. Seybold, 726 F.2d 502, 503 (9th Cir.1984).
 
 
 56
 In Gates, the Supreme Court stated that "the task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him ... there is a fair probability that contraband or evidence of a crime will be found in a particular case." Gates, 462 U.S. at 238, 103 S.Ct. at 2332. Barnhill contends that the affidavits at issue do not satisfy Gates' "totality of the circumstances" approach.
 
 
 57
 i. LaClede Residence.
 
 
 58
 The first search warrant was for Barnhill's house in LaClede, Idaho. Among items seized were numerous books on warfare, clips and ammunition, a shotgun, and plans for a firearm silencer. More importantly, one of the most important pieces of evidence in the entire case was found in this search--a copy of the "Rules for Security" of the Order. The document allowed the government to understand the structure and membership of the group.
 
 
 59
 The affidavit presented to the magistrate asked for a search warrant to search for evidence from the Ukiah armored car robbery. The affidavit contained the following information:
 
 
 60
 1. The affiant had been an FBI agent for 22 years.
 
 
 61
 2. A search of the armored car after the Ukiah robbery turned up a gun registered to Barnhill.
 
 
 62
 3. Barnhill had been arrested one month prior to the Ukiah armored car robbery and found in his car were spent cartridges of the same caliber as found at the Ukiah crime scene. Also found at this arrest were two birth certificates, one in his own name and one in the name of "Keith Merwin". Also found was a Montana drivers license in the name of "Merwin".4. A photo of Barnhill on his Montana driver's license resembled artist's sketches prepared from data provided by an owner of one of the Ukiah getaway cars.
 
 
 63
 5. Barnhill used an alias while living in Montana.
 
 
 64
 6. "Keith Merwin" is dead.
 
 
 65
 7. "Keith Merwin" rented the house to be searched pursuant to the search warrant.
 
 
 66
 8. The lessor of the LaClede house had seen 15 men going to and from the house, but had not seen Barnhill/"Merwin" since July 7, 1984.
 
 
 67
 The information provided in the affidavit was sufficient to support a Gates probable cause finding. Two pieces of information included in the affidavit are particularly important. First, a gun registered to Barnhill was found at the Ukiah crime scene. This fact clearly tied Barnhill to that crime. Second, Barnhill's prior use of the "Merwin" alias and his renting the LaClede house under that name directly tied him to that residence. Barnhill makes much of the fact that his landlady had not seen him at the LaClede house since July 7, 1984 (the Ukiah robbery was on July 19, 1984). This one factor, however, cannot destroy the "common sense" determination that there was a good chance that evidence of the Ukiah robbery would be found at that residence. Denial of Barnhill's motion to suppress evidence seized from the LaClede house was proper.
 
 
 68
 ii. Kalispell Storage Locker.
 
 
 69
 On January 10, 1985, a search warrant for a storage locker in Kalispell, Montana was issued by a magistrate. Items seized clearly linked Barnhill to the Order. Among them were a "voice stress analyzer" and three tapes. On the tapes were the questions and answers given to new members of the order to determine whether they were undercover agents. Barnhill had been arrested in Kalispell on January 7, 1985. Barnhill contends that the affidavit in support of the search warrant did not demonstrate a sufficient nexus between himself and a "Patrick De Berrio" who rented the storage locker. Barnhill's claim falls before the Gates "totality of the circumstances" test.
 
 
 70
 The affidavit provided the following information:
 
 
 71
 1. Barnhill had participated in the Ukiah robbery and a gun used in that robbery had been traced to him.
 
 
 72
 2. Barnhill was a member of the Order.
 
 
 73
 3. The Order had used storage lockers in the past to store weapons and other evidence of criminal activity.
 
 
 74
 4. A confidential source, whose reliability had not been established, informed the FBI that a "William Rose" had rented storage locker "G" at the storage locker complex, and that "Rose" had possibly rented it under a different name.
 
 
 75
 5. When arrested Barnhill had given the name "William Lee Rose."
 
 
 76
 6. An anonymous phone call to the FBI told them that storage locker G-1 contained a computer and boxes of ammunition.
 
 
 77
 7. Independent investigation revealed that the storage locker complex existed.
 
 
 78
 8. The proprietor of the facility told the FBI that there were three "G" units at the complex--G-1, 2, and 3. And the proprietor personally knew the renters of G-2 and G-3 and didn't personally know the renter of G-1.
 
 
 79
 9. Records of the facility showed that G-1 was rented to a "Patrick De Berrio" for cash. "De Berrio", when he rented the locker, provided no address or phone number.
 
 
 80
 10. A check of Montana motor vehicle records, driver's license records, Kalispell telephone records, and FBI files revealed no information about a "Patrick De Berrio".
 
 
 81
 Barnhill claims that the connection between himself and the person who rented the locker was tenuous. He notes the connection was provided by a "confidential source whose reliability had not been established." Barnhill argues that the tips provided by the various informants were not credible and did not provide the magistrate with the ability to determine the "basis of knowledge" of the informants. In Gates, the Supreme Court rejected a line of cases which required that tips be judged by a rigid two-prong test: first, whether the tip adequately revealed the "basis of knowledge" of the informant and second, whether the tip provided facts sufficiently establishing the "veracity" or "reliability" of the informant's report. Gates, 462 U.S. at 230, 103 S.Ct. at 2328; See Spinelli v. United States, 393 U.S. 410, 416, 89 S.Ct. 584, 589, 21 L.Ed.2d 637 (1969); Aguilar v. Texas, 378 U.S. 108, 114, 84 S.Ct. 1509, 1514, 12 L.Ed.2d 723 (1964) (cases diverged from in Gates ). Instead, the Court adopted the "totality of the circumstances" approach.
 
 
 82
 One of the factors on which the Court placed great weight in Gates was the corroboration of details of an informant's tip by independent police investigation. Gates, 462 U.S. at 241-42, 103 S.Ct. at 2333-34. See also Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959) (later overruled); United States v. Landis, 726 F.2d 540, 542 (9th Cir.), cert. denied, 467 U.S. 1230, 104 S.Ct. 2688, 81 L.Ed.2d 882 (1984). In the instant case, the FBI's own investigation established that there was a storage locker complex as described by its first confidential source. The source told them that the locker had been rented by a "William Rose", the name given by Barnhill when he was arrested three days before. Also, it learned from the proprietor of the facility that only locker G-1 could possibly be the appropriate unit. Their investigation uncovered that "Patrick De Berrio" probably did not exist. The FBI also knew that Barnhill used aliases as a standard practice. The two tips taken together tended to corroborate one another. "Interlocking tips from different confidential informants enhance the credibility of each." Landis, 726 F.2d at 543. Based on the totality of these circumstances, there was a "substantial basis" for the magistrate's probable cause determination. The district court properly denied Barnhill's motion to suppress evidence seized from the locker.
 
 
 83
 (b). Search of Atkins' Shack.
 
 
 84
 Appellant Lane argues that the trial court erred in denying his motion to suppress evidence seized from a shack he occupied shortly before his arrest. Found in the search and introduced at trial were a rifle, ammunition, radio scanners, false identifications, and a copy of the Order's "Declaration of War." Motions to suppress are reviewed de novo. United States v. Andrade, 784 F.2d 1431, 1433 (9th Cir.1986). Findings of fact made at a suppression hearing, however, will be overturned on appeal only if clearly erroneous. United States v. Dubrofsky, 581 F.2d 208, 212 (9th Cir.1978).
 
 
 85
 The FBI arrested Lane in Winston-Salem, North Carolina, on Saturday, March 30, 1985. At the time of his arrest, Lane was accompanied by a Keith Atkins. Atkins told the FBI that Lane was staying in a shack he owned in Virginia. Atkins took the agents to the shack that same night and consented to a search. The agents did not have a search warrant to search the shack.[5] On appeal, Lane argues that Atkins did not have authority to consent to the search and the FBI did not have a reasonable belief in Atkins' authority to consent to the search.
 
 
 86
 A landlord generally may not give consent to the search of a dwelling rented to another. Chapman v. United States, 365 U.S. 610, 616-17, 81 S.Ct. 776, 779-80, 5 L.Ed.2d 828 (1961). Only the occupier or renter can waive the right to object to a search. Stoner v. California, 376 U.S. 483, 489, 84 S.Ct. 889, 893, 11 L.Ed.2d 856 (1964). However, "when the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that consent was given by the defendant, but may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." United States v. Matlock, 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974). See also Dubrofsky, 581 F.2d at 212. "Common authority" rests on mutual use of the property by those generally having joint access or control so that it is reasonable to recognize that any of the parties has the right to permit inspection and others have assumed the risk that the third parties might consent to the search. Matlock, 415 U.S. at 171 n. 7, 94 S.Ct. at 993 n. 7; United States v. Gulma, 563 F.2d 386, 389 (9th Cir.1977). Even if the consenting third party does not in fact possess actual authority to consent, a warrantless search may be justified when the authorities have reasonable grounds to believe the consentor has apparent authority to consent. United States v. Sledge, 650 F.2d 1075, 1077-78 (9th Cir.1981).
 
 
 87
 Under the Matlock test, Atkins possessed actual authority to consent to the search. Atkins owned the shack and the surrounding property. Lane wanted to use the shack for a little more than a month. In return for Atkins allowing him to stay in the shack, Lane performed various chores around the property. On at least three of the four weekends that Lane was there, Atkins came up to visit Lane and stayed with him in the one habitable room of the dwelling. Atkins stayed with Lane on the night before Lane was arrested. The shack possessed no outside door (there was a door with a padlock going into the room inhabited by Lane), no window, and no utilities. There was no furniture except for a bed frame and an easy chair. There were two keys to the padlock. Lane kept one and the other was hidden under a rock on the property. Atkins knew where the second key was. Atkins had some of his own personal property in the same room inhabited by Lane. Atkins had complete access throughout the property in general, and to the room lived in by Lane in particular. It was as much his own place as it was Lane's. A party who "has the key to the premises and access throughout the residence" can give a valid consent to search. Dubrofsky, 581 F.2d at 212; Gulma, 563 F.2d at 389 (entrusting of key to consenter creates "assumption of the risk" that he will give consent to search); United States v. Green, 523 F.2d 968, 971 (9th Cir.1975). We hold that Atkins possessed "authority" over or had a "sufficient relationship" to the shack and the room where the evidence was found to satisfy the Matlock test.
 
 
 88
 Even if Atkins did not possess actual authority to search, the FBI agents reasonably believed in Atkin's apparent authority to consent. See Sledge, 650 F.2d at 1077-78; United States v. Lopez-Diaz, 630 F.2d 661, 666-67 (9th Cir.1980) (warrantless search proper where police officer in good faith relies on what reasonably, if mistakenly, appears to be third party's authority to consent). All of the facts outlined above were known to the FBI prior to the search. The trial court properly denied Lane's suppression motion.
 
 
 89
 5. Jury Records.
 
 
 90
 Appellant McBrearty states that he filed a motion with the trial court pursuant to 28 U.S.C. Sec. 1867(f) seeking jury records.[6] He claims that the motion was never acted on and he was never supplied with the records. Early on in the trial process, McBrearty attempted to represent himself pro se. Even after obtaining counsel, McBrearty persisted in filing pro se motions. Apparently, he mailed these motions directly to the United States Attorney and not to the trial court.
 
 
 91
 The trial court addressed McBrearty's motion: "Defendant McBrearty's Motion to Inspect Jury Records: Although this motion is not before the court, it may be noted that the government agrees that pursuant to the statutory provision for a motion concerning jury selection process under 28 U.S.C. Sec. 1867(a), the defendant may make an inspection for which defendant McBrearty moved." Whether McBrearty actually received or inspected the records does not appear from the record. On this state of the record, we decline to find that section 1867(f) was not complied with. The record does not reveal that a section 1867(f) motion was ever filed.
 
 
 92
 B. Trial Errors.
 
 
 93
 1. Coconspirator statements.
 
 
 94
 (a). Fed.R.Evid. 801(d)(2)(E).
 
 
 95
 Appellants Yarbrough, Kemp, Duey, Pierce, Lane, and Silva argue that it was error to admit into evidence various statements made by coconspirators. The appellants contend that the trial court erred in its finding that the statements were made "in furtherance" of a conspiracy. A district court's conclusion that statements are admissible under Fed.R.Evid. 801(d)(2)(E) because made "in furtherance" of a conspiracy is reviewed under the clearly erroneous standard. United States v. Moody, 778 F.2d 1380, 1382 (9th Cir.1985). Under the clearly erroneous standard of review an appellate court must accept the lower court's findings unless the appellate court is left with the definite and firm conviction that a mistake has been committed. Dollar Rent A Car of Washington, Inc. v. Travelers Indem. Co. 774 F.2d 1371, 1374 (9th Cir.1985) (same standard for criminal cases).
 
 
 96
 The appellants principally complain that statements made by Matthews, the leader of the Order, which implicated them in various crimes and RICO predicate acts, were not made "in furtherance" of the conspiracy. Fed.R.Evid. 801(d)(2)(E).[7] The objected to statements include:
 
 
 97
 1. Matthews' relation of details to testifying coconspirator Parmenter of the West and Berg murders.
 
 
 98
 2. Matthews' relation to testifying coconspirator Dye about Berg murder.
 
 
 99
 3. Matthews' relation to testifying coconspirator Merki of details of armored car robberies.
 
 
 100
 4. Matthews' relation to testifying coconspirator Martinez of Seattle armored car robbery.
 
 
 101
 5. Barnhill's statements to testifying coconspirator Rader of details of West murder.
 
 
 102
 6. Lane's statement to testifying coconspirator Martinez that Lane drove getaway car in Berg murder.
 
 
 103
 Mere conversations between coconspirators, or merely narrative declarations among them, are not made "in furtherance" of a conspiracy. United States v. Layton, 720 F.2d 548, 556-57 (9th Cir.1983), cert. denied, 465 U.S. 1069, 104 S.Ct. 1423, 79 L.Ed.2d 748 (1984) (narrations of past events inadmissible while expressions of future intent are admissible); United States v. Eubanks, 591 F.2d 513, 521 (9th Cir.1979). Rather, to be "in furtherance" the statements must further the common objectives of the conspiracy or set in motion transactions that are an integral part of the conspiracy. Layton, 720 F.2d at 556. Statements made to induce enlistment or further participation in the group's activities are considered to be "in furtherance" of the conspiracy. United States v. Dorn, 561 F.2d 1252, 1256-57 (7th Cir.1977) (per curiam), overruled on other grounds, United States v. Read, 658 F.2d 1225, 1236 n. 6 (7th Cir.1981). Likewise, statements made to prompt further action on the part of conspirators are admissible under 801(d)(2)(E), United States v. Kendall, 665 F.2d 126, 133 (7th Cir.1981), cert. denied, 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 140 (1982), as are those made to "reassure" members of a conspiracy's continued existence. United States v. Mason, 658 F.2d 1263, 1270 (9th Cir.1981). Statements made to allay a coconspirator's fears are admissible. Eubanks, 591 F.2d at 521 n. 7. Most importantly, statements made to keep coconspirators abreast of an ongoing conspiracy's activities satisfy the "in furtherance" of requirement. United States v. Eaglin, 571 F.2d 1069, 1083 (9th Cir.1977), cert. denied, 435 U.S. 906, 98 S.Ct. 1453, 55 L.Ed.2d 497 (1978); Moody, 778 F.2d at 1382 (statements made to "higher ups" of the group are "in furtherance").
 
 
 104
 The statements at issue fit most if not all of the standards outlined in the above cases. In particular, Matthews' statements are admissible because they were made with the intent to keep his coconspirators abreast of what the Order had done, was doing, or would do in the future. His relation of the details of the West murder to various testifying coconspirators served to apprise them of the "successful" resolution of a perceived security problem. The same is true of Barnhill's and Lane's declarations concerning the details of the West murder. Details of the Berg murder tended to show that one of the prime goals of the Order, the elimination of Jewish "domination" of American life, had been spectacularly furthered. All of these statements were properly admitted under 801(d)(2)(E) as made "in furtherance" of the aims of the conspiracy. The court's decision to admit them was not clearly erroneous.
 
 
 105
 (b). Confrontation Clause Challenge
 
 
 106
 The appellants argue that even if the statements were properly admitted under 801(d)(2)(E), their admission is still susceptible to confrontation clause scrutiny. See Ohio v. Roberts, 448 U.S. 56, 65, 100 S.Ct. 2531, 2538, 65 L.Ed.2d 597 (1980) (confrontation clause operates to restrict the range of admissible hearsay).
 
 
 107
 The Supreme Court recently held, however, that the requirements of 801(d)(2)(E) and the confrontation clause of the sixth amendment are identical. Bourjaily v. United States, --- U.S. ----, 107 S.Ct. 2775, 2782-83, 97 L.Ed.2d 144 (1987); United States v. Inadi, 475 U.S. 387, 400, 106 S.Ct. 1121, 1129, 89 L.Ed.2d 390 (1986). Therefore, because the requirements of 801(d)(2)(E) have been met there was no independent violation of the confrontation clause. See United States v. Paris, 827 F.2d 395, 400-01 (9th Cir.1987).
 
 
 108
 2. Pierce Confession.
 
 
 109
 Appellants Yarbrough, Kemp, Duey, Lane and Silva contend that it was error to admit testimony from a federal agent concerning a codefendant's (Pierce) confession. The agent testified to an interview with Pierce after he was in custody regarding Pierce's participation in the Order's criminal activities. The confession also revealed general information about the Order's activities and the participation of codefendants who had already pled guilty to various charges of the indictment. The appellants argue that admission of the confession was a violation of the "Bruton" rule, Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), because it implicated them and they were unable to cross-examine Pierce to challenge his statements. "Bruton" claims address whether the defendant was able effectively to exercise his sixth amendment right of confrontation. Bruton, 391 U.S. at 126, 88 S.Ct. at 1622. Alleged constitutional errors require de novo review by the court of appeals. McConney, 728 F.2d at 1207.
 
 
 110
 In Bruton, two defendants, Evans and Bruton, were jointly tried. A federal agent testified to Evans' confession which stated that both he and Bruton had committed a crime. The trial court instructed the jury that the confession was to be used only against the declarant and not against Bruton. The Supreme Court reversed Bruton's conviction. It held that "because of the substantial risk that the jury, despite instructions to the contrary, looked to the incriminating extrajudicial statements in determining petitioner's guilt, admission of Evans' confession in this joint trial violated petitioner's right of cross-examination secured by the Confrontation Clause of the Sixth Amendment." Bruton, 391 U.S. at 126, 88 S.Ct. at 1622. The Court explicitly found that instructions telling the jury to apply extrajudicial statements only as to the declarant were intrinsically ineffective. Id. at 129, 88 S.Ct. at 1624.
 
 
 111
 However, Bruton does not require that all extrajudicial statements or confessions not be used in a joint trial. Rather, only those statements that "clearly inculpate" the defendant or are "powerfully incriminating" implicate the "Bruton" rule. Richardson v. Marsh, 481 U.S. 200, 107 S.Ct. 1702, 1707, 95 L.Ed.2d 176 (1987); Bruton, 391 U.S. at 124 n. 1, 135, 88 S.Ct. at 1621 n. 1, 1627; United States v. Brooklier, 685 F.2d 1208, 1218 (9th Cir.1982) (per curiam), cert. denied, 459 U.S. 1206, 103 S.Ct. 1194, 75 L.Ed.2d 439 (1983). The Supreme Court, in its latest treatment of the "Bruton" rule, has definitively found that redaction serves to eliminate any Bruton problems:
 
 
 112
 We hold that the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when, as here, the confession is redacted to eliminate not only the defendant's name, but any reference to her existence.
 
 
 113
 Marsh, 107 S.Ct. at 1709. See also Bruton, 391 U.S. at 134 n. 10, 88 S.Ct. at 1626 n. 10; United States v. Wright, 742 F.2d 1215, 1223 (9th Cir.1984).
 
 
 114
 The agent testifying to the confession never mentioned any of the nontestifying appellants. The statement was completely redacted so as to prevent reference to the appellants. Also, the trial court, both when the Pierce confession testimony was offered and when the case went to the jury, explicitly instructed that the confession was to be considered only against Pierce. There was no Bruton error.
 
 
 115
 3. Rader Testimony.
 
 
 116
 Appellant McBrearty contends that the government improperly entered into a contingent plea agreement with a coconspirator named Randall Rader. Rader testified against McBrearty. McBrearty claims that the plea agreement so tainted Rader's testimony that it violated the appellant's due process rights. McBrearty never raised this issue with the trial court. When an appellant raises an issue on appeal that was not raised before the district judge, the court of appeals employs the plain error standard of review. See United States v. Bustillo, 789 F.2d 1364, 1367 (9th Cir.1986); Fed.R.Evid. 103(d). A plain error is a highly prejudicial error affecting substantial rights. Bustillo, 789 F.2d at 1367.
 
 
 117
 The general rule is that an accomplice who has pled guilty may testify against non-pleading defendants without raising due process concerns. United States v. Dailey, 759 F.2d 192, 198 (1st Cir.1985). The courts have long allowed such witnesses to testify and have relied on cross-examination to uncover any false testimony that might be given. Id. at 196. Such agreements will generally be upheld if the jury is informed of the exact nature of the agreement, defense counsel is permitted to cross-examine the accomplice about the agreement, and the jury is instructed to weigh the accomplice's testimony with care. Id.; see also United States v. Insana, 423 F.2d 1165, 1169 (2d Cir.), cert. denied, 400 U.S. 841, 91 S.Ct. 83, 27 L.Ed.2d 76 (1970).
 
 
 118
 In the instant case, the jury was thoroughly informed of the nature of the plea agreement. At the beginning of the government's direct examination of Rader, he testified that he had pled guilty to a charge of racketeering and faced a maximum sentence of 20 years imprisonment and a $25,000 fine. He related that his plea was entered in connection with an agreement with the prosecution that in return for his promise to "tell the truth and furnish the truth about all subjects involved" the government would drop all other charges against him and would inform the sentencing judge "to the extent of [Rader's] cooperation."
 
 
 119
 Defense counsel also vigorously cross-examined Rader about the plea agreement and what it required from Rader. Specifically, cross-examination focused on how and what the government would recommend to the sentencing judge based on the extent of Rader's "cooperation" in testifying about other members of the Order. Finally, the jury was instructed to weigh the testimony of accomplices with great caution and care:
 
 
 120
 The government has the right to use as a witness any person to whom it has granted immunity from prosecution. The testimony of one to whom immunity has been granted is received with greater caution and weighed with more care than the testimony of an ordinary witness. You should consider that testimony carefully to determine whether in your opinion the immunized witness may have testified falsely in order to further his own interest. You should give that testimony the weight which in your judgment it is fairly entitled to receive.
 
 
 121
 All the Dailey factors have been met in this case.
 
 
 122
 In addition, the present agreement was an unexceptional plea bargain. Other much more contingent plea agreements have survived judicial scrutiny. United States v. Valle-Ferrer, 739 F.2d 545, 546-47 (11th Cir.1984) (witness' anticipated receipt of money if his testimony resulted in conviction did not make him incompetent to testify); United States v. Kimble, 719 F.2d 1253, 1255 (5th Cir.1983), cert. denied, 464 U.S. 1073, 104 S.Ct. 984, 79 L.Ed.2d 220 (1984) (agreement operative only if witness' cooperation found acceptable); Insana, 423 F.2d at 1168-69 (that pleader not yet sentenced did not disqualify him as a witness); United States v. Crim, 340 F.2d 989, 990 (4th Cir.1965) (agent witness' testimony admissible though compensation determined on basis of its result). See also United States v. Claiborne, 765 F.2d 784, 792 n. 2 (9th Cir.1985), cert. denied, 475 U.S. 1120, 106 S.Ct. 1636, 90 L.Ed.2d 182 (1986) (government promise to recommend reduced sentence does not render plea agreement contingent). In all of these cases, the curative effects of cross-examination were considered adequate to protect the appellant's due process rights. See Hoffa v. United States, 385 U.S. 293, 311, 87 S.Ct. 408, 418, 17 L.Ed.2d 374 (1966) ("[t]he established safeguards of the Anglo-American legal system leave the veracity of a witness to be tested by cross-examination, and the credibility of his testimony to be determined by a properly instructed jury").[8] The Rader plea agreement and Rader's subsequent testimony did not violate McBrearty's due process rights.
 
 
 123
 4. Prosecutorial Misconduct.
 
 
 124
 Appellant McBrearty claims that it was error for the trial court to deny his motion for a mistrial based on prosecutorial misconduct. A district court's decision regarding whether to grant a motion for a mistrial is subject to an abuse of discretion standard. United States v. Smith, 790 F.2d 789, 795 (9th Cir.1986).
 
 
 125
 McBrearty was the only defendant to testify at trial. During the government's cross-examination, the prosecutor constructed a stratagem to point to McBrearty's guilt. As he cross-examined, the prosecutor wrote the following on a marker board:
 
 
 126
 G iven $100,000 cash.
 
 
 127
 U-haul [check with police to determine status of this vehicle seized by authorities].
 
 
 128
 I n disguise [at Order meeting].
 
 
 129
 L and purchase.
 
 
 130
 T elephone system [set up for Order members].
 
 
 131
 Y ears in jail [questioned prospective Order members about their willingness to endure this].
 
 
 132
 After McBrearty again denied knowing that the Order obtained money by robbery or other crimes, the prosecutor circled the first letter of each of the above phrases thus spelling out the word "guilty". The prosecutor then asked: "Isn't it a fact, Mr. McBrearty, that despite your attempts to explain and justify your conduct, what it all adds up to is that you're guilty as charged in this indictment?" McBrearty objected and moved for a mistrial. His motion was denied. No curative instruction was given.
 
 
 133
 McBrearty argues that the use of the marker board and the accompanying question constituted prosecutorial misconduct. He argues that the prosecutor improperly and prejudicially stated his personal belief of the appellant's guilt. The actual question put to McBrearty was not improper. It does not express any personal belief of the prosecutor. It simply asks McBrearty whether he was guilty. However, the prosecutor's trick at the marker board is perhaps a different matter. The trial judge, at a side-bar, admonished the prosecutor and noted that "on too many occasions ... you have taken it upon yourself to make remarks that were out of line."
 
 
 134
 On balance, however, the prosecutor's actions were not outrageous enough to require a mistrial. Every slight excess of a prosecutor does not require that a verdict be overturned and a new trial ordered. United States v. Chapman, 615 F.2d 1294, 1301 (10th Cir.), cert. denied, 446 U.S. 967, 100 S.Ct. 2947, 64 L.Ed.2d 827 (1980). Prosecutorial misconduct does not require reversal unless the misconduct deprives the defendant of a fair trial. See Smith v. Phillips, 455 U.S. 209, 219, 102 S.Ct. 940, 947, 71 L.Ed.2d 78 (1982). The test for determining whether prosecutorial misconduct requires a mistrial is whether the remarks were improper and whether they prejudicially affected substantial rights of the defendant. United States v. Dorr, 636 F.2d 117, 120 (5th Cir. Unit A Feb. 1981) (improper statements in closing arguments). Also, misconduct does not require reversal where there is strong evidence of the defendant's guilt. United States v. Parker, 549 F.2d 1217, 1221 (9th Cir.), cert. denied, 430 U.S. 971, 97 S.Ct. 1659, 52 L.Ed.2d 365 (1977) (following Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967) (harmless error standard)).
 
 
 135
 McBrearty was convicted of Counts I and II of the indictment (the substantive RICO count and the conspiracy RICO count). The evidence of his participation in the activities of the Order was overwhelming. Testimony at trial established that McBrearty joined the Order immediately after the Ukiah armored car robbery in 1984. He was recruited to serve as a lay "legal adviser" to the group and to conduct "voice stress analysis" on prospective members. Evidence at trial established that he disposed of stolen money for purposes of the Order. He also set up a phone service where members of the Order who were arrested could call and arrange for legal representation. He also participated in a "trial" of an Order member who was "charged" with being a security risk. He voted to kill the offending member. He also received a "salary" from the Order from the proceeds of various armed robberies. Where the evidence was so strong against McBrearty, and the prosecutor's "misconduct" relatively innocuous, it cannot be said that McBrearty's rights were substantially affected. Denial of McBrearty's motion for mistrial was not an abuse of the trial court's discretion.
 
 
 136
 5. Witness Misstatements.
 
 
 137
 Twice at trial government witnesses made reference to the fact that appellant Yarbrough had previously been in prison:
 
 
 138
 That he [Yarbrough] had previously been in jail and had not had a lot of money and he was in financial difficulty, and then to arrive home with a brand new motorcycle seemed a little foolish.
 
 
 139
 Well he, Yarbrough, came in and he had this machine gun again. Then he put a silencer on it, put a hand gun or something on the table. He laid on the bed, took off his shirt and he had tattoos on him. He was saying he got them in prison or some stuff like that.
 
 
 140
 Appellant's counsel did not object in front of the jury to these references but contemporaneously asked the court if he could "address" the court at the end of the day. At the end of the day, appellant moved for a mistrial. The trial court denied both motions.[9] Both times the judge gave a curative instruction the next day to the jury.[10] No further reference to Yarbrough's time in prison was made. The prosecution did not mention it in its closing argument. Yarbrough correctly notes that it would be error to admit testimony that he had previously been in prison. He argues that despite the curative instruction it was impossible for the jury to disregard these references.
 
 
 141
 These isolated references to Yarbrough's prior prison record did not warrant a mistrial. Yarbrough does not argue that their admission constituted any sort of constitutional error, nor could he. They simply are violations of the federal rules of evidence. "When an error in the admission of evidence is not of constitutional proportions, reversal is not required unless it is more probable than not that the error materially affected the verdict." United States v. Guerrero, 756 F.2d 1342, 1347 (9th Cir.), cert. denied sub nom. Booth v. United States, 469 U.S. 934, 105 S.Ct. 334, 83 L.Ed.2d 270 (1984).
 
 
 142
 In United States v. Hernandez-Miranda, 601 F.2d 1104 (9th Cir.1979), the court affirmed a conviction where the trial court erroneously admitted evidence of a prior conviction and where, in closing argument, the prosecutor made reference to the wrongfully admitted evidence. In addition, the court did not give a curative instruction. Though the appellate court found it error to admit the evidence, it nevertheless found it not to be prejudicial. The court noted the strong independent evidence of the defendant's guilt and that the government did not unnecessarily dwell on the past crimes evidence.
 
 
 143
 In the instant case, there was overwhelming independent evidence of Yarbrough's participation in the various crimes of the Order. Also, the government did not again mention the statements. Finally, the judge's curative instruction was sufficient to protect Yarbrough from improper prejudice on the part of the jury. There is a strong presumption that appropriate jury instructions will cure any taint of the wrongful admission of such statements. United States v. Pavon, 561 F.2d 799, 803 (9th Cir.1977). Two isolated, inadvertent instances of evidentiary error in 79 days of trial cannot be considered prejudicial in comparison to that independent evidence. See Guerrero, 756 F.2d at 1347 (passing reference in 11-day trial to defendant's prison time not prejudicial). The trial court did not abuse its discretion by denying Yarbrough's motions for a mistrial.
 
 
 144
 6. RICO Conspiracy--First Amendment.
 
 
 145
 Evans argues that his conviction on the RICO conspiracy count violated his first amendment rights of political advocacy and association. He contends that the judge's instructions permitted the jury to convict him solely for agreeing with others to overthrow the U.S. government by violent means. Evans' claim is without merit. Under 18 U.S.C. Sec. 1962(c) and (d), Congress has made association with an enterprise one element of a RICO offense. United States v. Turkette, 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1981); United States v. Rubio, 727 F.2d 786, 792 (9th Cir.1984). This element does not unconstitutionally punish associational status. The courts have recognized that RICO proscribes conduct and not status or belief. Rubio, 727 F.2d at 792 (discussing section 1962(c)); United States v. Elliott, 571 F.2d 880, 903 (5th Cir.), cert. denied sub nom. Delph v. United States, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978) (discussing section 1962(d)). The judge's instructions in the instant case on the conspiracy count are standard conspiracy instructions requiring proof of overt acts in furtherance of the conspiracy. The conspiracy charge also essentially tracked 18 U.S.C. Sec. 1962(d). The instructions properly charged a RICO crime and avoided any first amendment problems.
 
 
 146
 7. Craig--Jury Instructions.
 
 
 147
 Appellant Craig claims that it was error for the trial court not to give her proposed jury instructions. She argues that the court failed to give appropriate instructions reflecting her theory of the case. Craig's contention is wholly without merit.
 
 
 148
 The general principle is well established that a criminal defendant is entitled to have a jury instruction on any defense which provides a legal defense to the charge against him and which has some foundation in the evidence, even though the evidence may be weak, insufficient, inconsistent, or of doubtful credibility. United States v. Escobar de Bright, 742 F.2d 1196, 1198 (9th Cir.1984) (quoting United States ex rel. Peery v. Sielaff, 615 F.2d 402, 403 (7th Cir.1979), cert. denied, 446 U.S. 940, 100 S.Ct. 2163, 64 L.Ed.2d 794 (1980)). Failure to give such a requested instruction is reversible error. United States v. Noah, 475 F.2d 688, 697 (9th Cir.), cert. denied, 414 U.S. 1095, 94 S.Ct. 728, 38 L.Ed.2d 553 (1973). The trial judge, however, must be given wide latitude in tailoring the instructions. Challenge to the instructions' language or formulation is reviewed only for an abuse of discretion. Burgess, 791 F.2d at 680.
 
 
 149
 On appeal, Craig argues that her theory of the case, as it related to the Alan Berg murder, was that Merki, another coconspirator, was responsible for surveilling Berg. Her theory was that a witness mistook her for Merki and she in fact had nothing to do with the surveillance of Berg. Craig argues that the trial court failed to instruct the jury on this "identity" claim. Of the four instructions that Craig offered, only one dealt with the Berg murder. Strangely, on appeal, she argues that all four should have been given in relation to the Berg/"identity" issue. Craig's proposed instruction number two states:
 
 
 150
 Jean Craig has pleaded "not guilty" to the charge that she conducted the surveillance of Alan Berg. This plea puts at issue each of the essential elements of the offense of murder under Colorado law described in these instructions, and imposes on the government the burden of establishing each of these elements beyond a reasonable doubt. After you have considered all the evidence, if you have a reasonable doubt whether Jean Craig or some other defendant committed the act charged, you must find the defendant not guilty.
 
 
 151
 This instruction is a general burden of proof instruction that does not argue a "theory of the case". The judge gave an instruction which essentially duplicated Craig's proposed instruction. The instruction properly addressed the burden of proof and stated that the government must prove every element of the crime beyond a reasonable doubt:
 
 
 152
 The burden is upon the government to prove the guilt of a defendant beyond a reasonable doubt. Unless the government proves beyond a reasonable doubt that the defendant has committed every element of the offenses with which he or she is charged, you must find him or her not guilty as to any charge not so proven.
 
 
 153
 Later, the judge instructed the jury as to the Berg predicate act charge and outlined what the jury had to find to determine that Craig had committed that crime. The judge's instructions addressed the "identity" issue as well as, or better than, Craig's proposed instruction. A defendant is not entitled to an instruction using her exact words. The trial court has leeway to formulate the instruction in its own fashion. Id. The trial judge did not abuse his discretion by not using Craig's proposed instruction.
 
 
 154
 8. Conspiracy to Rob Armored Car.
 
 
 155
 In Count III of the indictment, appellants Duey and Pierce were charged with conspiracy to rob an armored car courier in violation of 18 U.S.C. Sec. 1951.[11] The appellants argue that there was insufficient evidence of an "agreement" among the alleged conspirators to rob the armored car courier and insufficient evidence of the particular conspiracy charged in the indictment. The appellants moved for a judgment of acquittal under Fed.R.Crim.P. 29(a). It was denied. The test for determining whether to grant a motion for judgment of acquittal under Rule 29 is whether, viewing the evidence in the light most favorable to the government, there was relevant evidence from which the jury could reasonably find the accused guilty beyond a reasonable doubt of each element of the crime charged. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (sufficiency of the evidence standard); United States v. Dior, 671 F.2d 351, 357 (9th Cir.1982) (standard of review for Rule 29 motions).
 
 
 156
 A conspiracy is defined as an agreement between two or more people to commit an unlawful act. It requires some form of a "meeting of the minds." Escobar De Bright, 742 F.2d at 1199. Inferences of the existence of an agreement may be drawn if there is "concert of action, all the parties working together understandingly, with a single design for the accomplishment of a common purpose." United States v. Melchor-Lopez, 627 F.2d 886, 890 (9th Cir.1980) (citation omitted).
 
 
 157
 In November, 1983, Matthews, Duey and Pierce, among others, traveled to Seattle with the intent to commit an armed robbery. They carried weapons with them to accomplish such a crime. Both Duey and Pierce participated in surveillance of several stores in the Seattle area to determine which to rob when its armored car arrived. The group then "voted" that a Fred Meyer Store was the best location to accomplish the robbery of an armored car courier. Both Pierce and Duey participated in the detailed planning of the Fred Meyer robbery and their eventual escape. A coconspirator testified that the group was "at the point where the plan was developed and [the appellants] were thinking about proceeding with the plan." The only reason the robbery was not immediately carried out was that one of the coconspirators (not Duey or Pierce), for "religious" reasons, wanted to back out of the robbery. The group then returned to Idaho. This evidence adduced at trial, both direct and inferential, clearly showed an agreement among the appellants and others to accomplish the robbery.
 
 
 158
 The appellants also claim that because of the earlier decision not to rob the armored car courier immediately, the government adduced insufficient evidence of their agreement to carry out the "particular" conspiracy. The appellants' claim flies in the face of the overwhelming evidence of the group decision to commit the robbery. Some four months later in March, 1984, virtually the same group, including Pierce and Duey, went back to Seattle and robbed the same armored car company, at the same store, pursuant to the exact plan that was developed by the coconspirators in November of 1983. Also, the appellants participated both in the planning and execution of the robbery. There was certainly sufficient, if not overwhelming, evidence of their participation in the conspiracy to commit the particular robbery. It was not error for the trial court to deny the appellants' motion for acquittal.
 
 
 159
 9. Harboring a Fugitive.
 
 
 160
 Appellants Silva and Duey argue it was error for the trial court to deny their motion for acquittal on the charge of harboring and concealing a fugitive (Matthews). 18 U.S.C. Sec. 1071.[12] They argue there was insufficient evidence to convict them of the charge.
 
 
 161
 18 U.S.C. Sec. 1071 requires proof of four elements:
 
 
 162
 First, proof that a federal warrant had been issued for the fugitive's arrest. Second, that the Appellant had knowledge that a warrant had been issued.... Third, that the Appellant actually harbored or concealed [the fugitive]. Finally, that Appellant intended to prevent [the fugitive's] discovery or arrest.
 
 
 163
 United States v. Silva, 745 F.2d 840, 848 (4th Cir.1984), cert. denied, 470 U.S. 1031, 105 S.Ct. 1404, 84 L.Ed.2d 791 (1985); United States v. Bekowies, 432 F.2d 8, 14 (9th Cir.1970). Not all acts that provide some form of "assistance" to a fugitive constitute a violation of the statute. Supplying "financial assistance" to a fugitive does not rise to the level of harboring or concealing. United States v. Foy, 416 F.2d 940, 941 (7th Cir.1969). Failure to disclose a fugitive's location to the authorities also is not criminal under the statute. Id. False statements to police also do not lie within the scope of the statute. United States v. Magness, 456 F.2d 976, 978 (9th Cir.1972). However, "any physical act of providing assistance, including food, shelter, and other assistance to aid the prisoner in avoiding detection and apprehension" will make out a violation of section 1071. United States v. Kutas, 542 F.2d 527, 528 (9th Cir.1976), cert. denied, 429 U.S. 1073, 97 S.Ct. 810, 50 L.Ed.2d 790 (1977). In addition, the government may prove knowledge of the warrant by inference. Id. See also Silva, 745 F.2d at 848.
 
 
 164
 Silva and Duey claim there was insufficient evidence that they actually harbored or concealed Matthews or that they had knowledge of the federal warrant. Their contentions are without merit. On November 14, 1984, FBI agents cornered Yarbrough and Matthews in a Portland hotel. Yarbrough was captured but Matthews escaped with a wound to his left hand. A federal warrant was issued for his arrest. Matthews hitched a ride to the Mt. Hood area and went to a house that had been rented by the Order. Duey and others the next day read a newspaper account about the wounding of Matthews and the arrest of Yarbrough. Silva was at the Mt. Hood house and he and Matthews left in a pickup that belonged to Silva. Matthews and Silva went to a motel in Everett, Washington, where they joined Duey and other members of the Order. The group, including Duey and Silva, discussed how to obtain medical treatment for Matthews' wound without raising a doctor's suspicions. It was Duey's idea that Matthews go to Whidbey Island, Washington, to escape capture. The next day Silva and Matthews went to Whidbey Island together. Silva purchased a car in a false name to be used as a getaway vehicle. Silva was present when Matthews related the story of the shoot-out and capture of Yarbrough. Matthews mentioned that there were 50 agents on his case.
 
 
 165
 The evidence, both direct and inferential, is overwhelming that Duey and Silva acted to harbor the fugitive Matthews and knew that he was sought by federal agents under a warrant. Both Duey and Silva were in contact with Matthews soon after the Portland shootout. Both Duey and Silva knew that Yarbrough had been arrested and federal agents were seeking Matthews. They both actively took steps to insure his escape from the authorities. There was sufficient evidence of both active harboring and knowledge of a federal warrant against both to support a conviction under section 1071. See Silva, 745 F.2d at 848 (defendants watching television report of fugitive's jail escape supports inference of knowledge of warrant); United States v. Giampa, 290 F.2d 83, 84-85 (2nd Cir.1961) (inference of knowledge from act of harboring itself). The trial court's denial of their motion for acquittal was proper.
 
 
 166
 10. RICO--"Through" Element.
 
 
 167
 Appellant Evans argues that there was insufficient evidence to find him guilty of Count I (substantive RICO count of the indictment). Evans concedes that the government proved several elements of a section 1962 violation. He admits he belonged to the Order, "an association in fact", constituting an "enterprise" under RICO. He also concedes that he engaged in a "pattern of racketeering activity" because he committed two related predicate offenses. He contends, however, that the government failed to adduce sufficient evidence that his pattern of racketeering activity was the means "through" which he participated in the Order/enterprise.
 
 
 168
 RICO requires that the defendant directly or indirectly conduct or participate in a RICO enterprise's affairs through a pattern of racketeering activity. The enterprise need not conduct the racketeering activity itself. Rather, there simply must be a "nexus" between the enterprise and the racketeering activity. Sun Sav. & Loan Ass'n v. Dierdorff, 825 F.2d 187, 194 (9th Cir.1987). A nexus exists "when (1) one is enabled to commit the predicate offenses solely by virtue of his position in the enterprise or involvement in or control over the affairs of the enterprise, or (2) the predicate offenses are related to the activities of that enterprise." United States v. Scotto, 641 F.2d 47, 54 (2d Cir.1980), cert. denied, 452 U.S. 961, 101 S.Ct. 3109, 69 L.Ed.2d 971 (1981).
 
 
 169
 The Ninth Circuit has adopted the Scotto test. "Under this 'connection' or 'nexus' requirement, the racketeering activity must in some way stem from the enterprise's activities or otherwise have some relationship to the enterprise." Dierdorff, 825 F.2d at 195 (citing Scotto ). Further, the nexus requirement "practically vanishes along with the enterprise element whenever the enterprise is defined as the association to commit the racketeering activity." United States v. Anderson, 626 F.2d 1358, 1366 n. 13 (8th Cir.1980), cert. denied, 450 U.S. 912, 101 S.Ct. 1351, 67 L.Ed.2d 336 (1981). Such was the case here. The Order itself was the enterprise definable as the "association". It committed all the racketeering activity. Also, the "nexus" requirement does not require that any benefit accrue to the enterprise because of a particular defendant's racketeering activity. Dierdorff, 825 F.2d 195; United States v. Hartley, 678 F.2d 961, 990-91 (11th Cir.1982), cert. denied, 459 U.S. 1170, 103 S.Ct. 815, 74 L.Ed.2d 1014 (1983). Rather, the enterprise is simply the means or structure through which the racketeering crimes occur.
 
 
 170
 Evans' insufficiency of the evidence claim is without merit. He admits that there was overwhelming evidence of his participation in three predicate acts--the Ukiah armored car robbery, and two "spending stolen money" offenses. Evans' claim seems to be that the government never proved that Evans' disposal of stolen money was done on the Order's behalf. However, under Dierdorff no benefit to the Order need be proved. 825 F.2d at 195. Rather, the racketeering activity must simply "stem from" the enterprise's activities or have "some relationship to" the enterprise to satisfy the "through" requirement. This is the case here. Evans' participation in the Ukiah armored car robbery undoubtedly "stemmed from" the Order's activities. Also, the stolen money Evans received as "salary" came from the Ukiah robbery as well as other robberies committed by the Order. The "relationship" of the money, and Evans' "disposal" of it, to the enterprise was clear. The government produced sufficient evidence that Evans' racketeering activities were the means "through" which he participated in the Order's affairs. Denial of his motion for acquittal was proper.C. Sentencing Errors.
 
 
 171
 1. Access to Presentence Report.
 
 
 172
 McBrearty claims that he was denied access to the presentence report in his case and, in fact, has never seen it. Fed.R.Crim.P. 32(c)(3) (defendant's right to disclosure of presentence report). McBrearty in his brief cites nothing in the record suggesting that he ever pursued the issue before the lower court. In any event, McBrearty did see the report. At his sentencing, his counsel referred to the report and challenged various items in it.
 
 
 173
 2. Appropriateness of sentence.
 
 
 174
 Appellants Yarbrough, Evans, Duey, Pierce and McBrearty attack the sentences imposed on them by the trial court. Yarbrough, Evans and McBrearty argue that the judge wrongfully sentenced them to consecutive sentences for their substantive RICO convictions and RICO conspiracy convictions. Yarbrough also claims error in a third consecutive sentence on another count of the indictment. Duey and Pierce argue that it was cruel and unusual punishment under the eighth amendment to sentence them to consecutive 20-year terms on Count III (conspiracy to rob armored car) of the indictment.
 
 
 175
 Sentencing is left to the sound discretion of the trial judge and his decision is reviewed only for an abuse of discretion. United States v. Messer, 785 F.2d 832, 834 (9th Cir.1986). The sentence imposed by a federal district judge, if within statutory limits, is generally not subject to review. United States v. Tucker, 404 U.S. 443, 447, 92 S.Ct. 589, 591, 30 L.Ed.2d 592 (1972); United States v. Washington, 578 F.2d 256, 258 (9th Cir.1978) ("It is established in this circuit that a sentence which is within the limits set by a valid statute may not be overturned on appeal as cruel and unusual."). If the sentence raises issues of constitutional magnitude however, review on appeal is more searching. Tucker, 404 U.S. at 447, 92 S.Ct. at 591.
 
 
 176
 Yarbrough, Evans, and McBrearty essentially make policy arguments that consecutive sentencing is disfavored in general. They also assert that consecutive sentencing for substantive RICO convictions and RICO conspiracy is improper. The former claim is better directed to the legislature than a court on appeal. The latter has been answered in this circuit by United States v. Rone, 598 F.2d 564 (9th Cir.1979), cert. denied sub nom. Little v. United States, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980). In Rone, the defendant was convicted under 18 U.S.C. Sec. 1962(c) and (d). He received maximum 20-year sentences for both convictions that were to run consecutively. The court noted the general rule that conspiracy and the substantive offenses that are its goal do not merge for the purposes of sentencing. See Ianelli v. United States, 420 U.S. 770, 781-82, 95 S.Ct. 1284, 1291-92, 43 L.Ed.2d 616 (1975). The Rone court looked to RICO's legislative history and determined that Congress intended that RICO impose "enhanced sanctions" on those engaging in racketeering activities. Rone, 598 F.2d at 572. The court found that consecutive sentencing on RICO and non-RICO substantive offenses serves the congressional purpose of providing new and greater penal prohibitions. Id. at 572. Consecutive sentencing of Yarbrough, Evans, and McBrearty was appropriate given the enormity of the crimes committed by these appellants.
 
 
 177
 Pierce and Duey's eighth amendment claim should likewise be rejected. The appellants rely on Solem v. Helm, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983), to argue that imposition of a 20-year consecutive sentence for Count III (conspiracy to rob an armored car) was disproportionate to the gravity of that offense.
 
 
 178
 In Solem, the Court addressed a sentence under a "habitual criminal" statute where the defendant was sentenced to life without possibility of parole. The defendant had previously been convicted six times for various non-violent crimes. His final crime was for passing a "no account" check. The Supreme Court found his sentence to constitute cruel and unusual punishment because it was disproportionate to the gravity of his offense. The Court held "as a matter of principle that a criminal sentence must be proportionate to the crime for which the defendant has been convicted." Solem, 463 U.S. at 290, 103 S.Ct. at 3009. The Court noted, however, that "proportionality" analysis is limited:
 
 
 179
 Absent specific authority, it is not the role of an appellate court to substitute its judgment for that of the sentencing court as to the appropriateness of a particular sentence; rather, in applying the Eighth Amendment the appellate court decides only whether the sentence under review is within constitutional limits. In view of the substantial deference that must be accorded legislatures and sentencing courts, a reviewing court rarely will be required to engage in extended analysis to determine that a sentence is not constitutionally disproportionate.
 
 
 180
 Id. at 290 n. 16, 103 S.Ct. at 3009 n. 16. The Court also stated that outside of capital punishment cases proportionality challenges should rarely be successful. Id. at 289-90, 103 S.Ct. at 3009-10.
 
 
 181
 The Court indicated that a reviewing court's proportionality analysis should be guided by several objective factors, including (1) the gravity of the offense and harshness of the penalty; (2) the sentences imposed on other criminals in the same jurisdiction; and (3) the sentences imposed for the same crime in other jurisdictions. Id. at 292, 103 S.Ct. at 3010.
 
 
 182
 Application of the first factor alone in the present case demonstrates the error of the appellants' claim. In Solem, the Court noted the relative innocuousness of the defendant's crimes. It noted that all of them were non-violent and probably the result of the defendant's alcoholism. The Court stated that comparisons should be made in light of the harm caused or threatened to the victim or society and the culpability of the offender. Id. The harm caused by Pierce and Duey's participation in the conspiracy was great. Though the armored car was not immediately robbed, some months later both appellants returned and accomplished the goal of their conspiratorial activities. Proceeds from the robbery enabled the Order to carry out other equally violent or more violent crimes. There is a difference in kind and not just degree between this kind of crime and the crime of the defendant in Solem. The sentence in the instant case was proportional to the crime committed. In fact, it was the appropriate sentence. The appellants' eighth amendment claim is without merit.
 
 CONCLUSION
 
 183
 We find that none of the appellants' claims require reversal or resentencing. AFFIRMED.
 
 
 
 *
 The panel finds this case appropriate for submission without argument pursuant to Fed.R.App.P. 34(a) and 9th Cir. R. 34-4
 
 
 [1]
 18 U.S.C. Sec. 1961(5) (Definitions--pattern of racketeering activity) requires that a defendant commit two acts of racketeering (predicate acts) to constitute a "pattern of racketeering activity" under RICO
 
 
 [2]
 Appellants Pierce and Lane were convicted in U.S. District Court, District of Colorado, under 18 U.S.C. Sec. 245(b)(2)(C) (Federally protected activities) and 2 for the slaying of Berg. Pierce does not frame his challenge to the indictment in regards to that conviction, but only in reference to possible state court homicide prosecutions
 
 
 [3]
 In Murphy v. Waterfront Comm'n., 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964), the Supreme Court set out the policies behind the fifth amendment privilege:
 The privilege against self-incrimination "registers an important advance in development of our liberty--'one of the great landmarks in man's struggle to make himself civilized.' " ... It reflects many of our fundamental values and most noble aspirations: our unwillingness to subject those suspected of crime to the cruel trilemma of self-accusation, perjury or contempt; our preference for an accusatorial rather than an inquisitorial system of criminal justice; our fear that self-incriminating statements will be elicited by inhumane treatment and abuses; our sense of fair play which dictates "a fair state-individual balance by requiring the government to leave the individual alone until good cause is shown for disturbing him and by requiring the government in its contest with the individual to shoulder the entire load," ... our respect for the inviolability of the human personality and of the right of each individual "to a private enclave where he may lead a private life," ... our distrust of self-deprecatory statements; and our realization that this privilege, while sometimes "a shelter to the guilty," is often "a protection to the innocent."
 Id. at 55, 84 S.Ct. at 1596-97 (footnote and citations omitted). The Murphy Court dealt with the issue of compelled testimony, not the tactical decision whether to testify. Murphy is not directly apposite to the instant case.
 
 
 [4]
 18 U.S.C. Sec. 2315 provides:
 Whoever receives, possesses, conceals, stores, barters, sells, or disposes of any goods, ... or money of the value of $5,000 or more, ... moving as, or which are a part of, or which constitute interstate or foreign commerce, knowing the same to have been stolen, unlawfully converted, or taken ... Shall be fined not more than $10,000 or imprisoned not more than 10 years, or both.
 18 U.S.C. Sec. 2(a) (principals) provides:
 (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
 
 
 [5]
 At the motion to suppress hearing, the agent responsible for the search testified that the FBI did not obtain a search warrant because of exigent circumstances. He testified that the FBI suspected that there were weapons, explosives and other evidence at the shack that might be removed by those sympathetic to Lane if the FBI took the time to pursue a search warrant. Also, the agent's district was the Middle District of North Carolina while the shack was in the Western District of Virginia. The closest magistrate was in Roanoke, Virginia, some 140 miles from the agents
 
 
 [6]
 Section 1867(f) provides that the "parties in a case shall be allowed to inspect, reproduce, and copy" records of the grand and petit jury selection process. 28 U.S.C. Sec. 1867(a) provides for dismissal of charges against the defendant if he is denied access to these records. See United States v. Studley, 783 F.2d 934, 938 (9th Cir.1986) (right to inspect jury lists is essentially unqualified)
 
 
 [7]
 801(d)(2)(E) (Statements which are not hearsay--Admission by party-opponent) provides: "A statement is not hearsay if--[it is a] statement by a coconspirator of a party during the course and in furtherance of the conspiracy."
 
 
 [8]
 McBrearty's reliance on the panel opinion in United States v. Waterman, 732 F.2d 1527, 1531 (8th Cir.1984), cert. denied, 471 U.S. 1065, 105 S.Ct. 2138, 85 L.Ed.2d 496 (1985), is misplaced. Upon rehearing en banc, the Eighth Circuit vacated the panel opinion by an equally divided vote. Id. at 1533. Accordingly, the Eighth Circuit has consistently recognized that neither the panel opinion nor the en banc decision in Waterman has any precedential value. United States v. Spector, 793 F.2d 932, 936 (8th Cir.1986); United States v. Garcia, 785 F.2d 214, 221 (8th Cir.1986), United States v. Fazzino, 765 F.2d 125, 126 (8th Cir.), cert. denied, 474 U.S. 851, 106 S.Ct. 150, 88 L.Ed.2d 124 (1985). Opinions which are affirmed by an equally divided en banc Court of Appeals have no precedential value. See Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 759 n. 5, 104 S.Ct. 1464, 1468 n. 5, 79 L.Ed.2d 775 (1984)
 
 
 [9]
 Both times the trial court accepted the prosecutor's apology for the witnesses' statements. The court was convinced that the government did not know the witnesses would make such references
 
 
 [10]
 The judge instructed the jury:
 [Y]esterday during the testimony--we had testimony from Mr. Merki that Mr. Yarbrough may have been in jail. There is no evidence of that before you in this case and you are instructed by me that you are not to consider that testimony from Mr. Merki. You are to strike it as though it has never been stated. Do any of you have problems with that? (No response.)
 Now, yesterday, there was testimony from Mr. Martinez concerning Mr. Yarbrough, ostensibly concerning a conversation which he had with Mr. Yarbrough relating to some tattoos. Mr. Martinez said that Mr. Yarbrough may have been in jail or prison. There is no evidence of that fact before you, ladies and gentlemen, and you are instructed that you are not to consider that testimony from Mr. Martinez. Do any of you have any difficulty with that? You know, sometimes we are talking about unringing a bell or whatever it is. It is an obligation which we have and I know that each and every one of you will do that, and we appreciate that.
 
 
 [11]
 18 U.S.C. Sec. 1951 provides:
 (a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years....
 
 
 [12]
 18 U.S.C. Sec. 1071 provides:
 Whoever harbors or conceals any person for whose arrest a warrant or process has been issued under the provisions of any law of the United States, so as to prevent his discovery and arrest, after notice or knowledge of the fact that a warrant or process has been issued for the apprehension of such person, shall be fined not more than ... $5,000 or imprison[ed] for not more than five years, or both.