UNITED STATES of America, Plaintiff–Appellee,

v.

Masala Majid JAMES, Defendant–Appellant.

No. 96–10388.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 14, 1997.

Decided March 19, 1998.

William M. Goodman, Joy A. Kruse, Topel & Goodman, San Francisco, CA, for defendant–appellant.

John P. Cove, Jr., Special Asst. U.S. Atty., San Francisco, CA, for plaintiff–appellee.

Before: THOMAS and TASHIMA, Circuit Judges, and SEDWICK, District Judge.*

## OPINION

SEDWICK, District Judge.

### BACKGROUND

We deal with a bank robber named James. Masala Majid James comes from a family that may have found a vocation in the surname's historical association with bank robbery. But times change, and bank robbers change with the times. While in state custody on other charges, James wrote to the United States Attorney and asked for a chance to cooperate in the prosecution of his father for bank robbery. When FBI agents responded to his invitation, James described his participation in two of his father's bank robberies and mentioned that his father had warned him about bank security devices.

Two years later, James was convicted of six bank robberies and one attempted bank robbery of his own. On appeal, James asserts that the district court erred when it conducted a pretrial telephone conference in his absence; excluded evidence of one witness' racial bias; admitted evidence of James' awareness of bank security devices; and admitted inculpatory statements made in voice mail messages and a telephone conversation. James also contends that the district court erred when it increased his offense level at sentencing, pursuant to United States Sentencing Commission Guideline § 3A1.1(b), which calls for such an adjustment where a victim is unusually vulnerable.

At trial the government presented what can only be described as overwhelming evidence of James' guilt. In addition to surveillance videos and photographs taken during each robbery, the government introduced testimony from eight bank tellers. Each teller described the crime witnessed and identified James as the robber. Tracey Baldridge, a friend of James, testified that, although it appeared James was unemployed, she had seen James with large amounts of money during the time when the banks were being

robbed. Having established that the robber's *modus operandi* included precautions intended to avoid bank security devices, such as trackers in bundles of currency, the prosecution elicited testimony from FBI Special Agent Jerry Webb, who said that James had knowledge of such devices. Webb also testified that James told Webb, with whom James had previously been cooperating, that Webb should realize there must be something going on in James' life for him to "do something like that" in a context where "that" likely referred to the bank robberies. The voice mail messages in which James made other less directly inculpatory remarks also came into evidence through Webb's testimony.

### DISCUSSION

A. James' Absence From The Pretrial Conference.

■ On March 29, 1996, Judge Wilken held a pretrial conference. Among matters discussed was James' effort to exclude testimony showing that he had knowledge of bank security devices, on the grounds that when he told the FBI about his father's warning, he was in custody and had been given no *Miranda* warning. James also argued that the evidence's probative value was so low that it should be excluded as prejudicial under Fed.R.Evid. 403. Judge Wilken took the matter under advisement.

Prior to trial, the case was reassigned to Judge Quackenbush, who conducted an unrecorded teleconference with counsel in which James did not participate. Under Fed. R.Crim.P. 43(c)(3), a defendant need not be present when a proceeding involves only a question of law, but James contends that the teleconference involved factual matters pertinent to disposition of the *Miranda* issues. Judge Quackenbush's subsequent statements on the record prior to trial reflect that he made two rulings during the teleconference. First, he ruled that the government could not elicit evidence of James' drug usage. The exclusion of drug evidence favored the defendant, so James cannot possibly have been prejudiced by that ruling. Second, the judge

---

* The Honorable John W. Sedwick, United States District Judge for the District of Alaska, sitting by designation.

ruled that the government could elicit evidence of James' possession of unexplained amounts of cash. James does not contend that this ruling was erroneous or that he was prejudiced by it. Rather, James contends that more occurred at the teleconference.

To show that the teleconference must also have involved some discussion of James' effort to exclude evidence that he had knowledge of bank security devices, James works back from a ruling Judge Quackenbush made on the first day of trial involving that topic. On that first day of trial, after advising he had read the briefs pertaining to the issue, the judge asked whether the parties had anything to add. In his brief, defense counsel had argued James' statements about bank security devices should be excluded because they were made to FBI agents who should have, but did not, give James a *Miranda* warning, and because the statements were unduly prejudicial under Fed.R.Evid. 403. However, in response to the opportunity to add to what had been said in the briefs, defense counsel urged only that the statements should be excluded on Fed.R.Evid. 403 grounds. The judge then ruled the statements showing James' knowledge of bank security devices would be admitted with some restrictions.[1] James now argues that, given the somewhat lengthier discussion of the *Miranda* issue at the evidentiary hearing before Judge Wilken, there must have been some discussion of the *Miranda* issue during the teleconference.

■ When considering a defendant's absence from a trial court proceeding, this court must determine "if there is no reasonable possibility that prejudice resulted from the absence." *United States v. Kupau*, 781 F.2d 740, 743 (9th Cir.1986). If proceeding in the defendant's absence violated the defendant's constitutional rights, the standard of review is harmless beyond a reasonable doubt.

■ Nothing but the sheerest speculation supports the proposition that James' effort to exclude evidence of his knowledge of bank security devices was discussed during the teleconference. Judge Quackenbush described what he had ruled on in the teleconference. The matters he said he had addressed did not include the evidence in dispute. Judge Quackenbush then turned to the disputed issue, saying that he had read the briefs and wanted to hear any further argument. That an attorney might choose not to repeat or embellish an argument already made in a brief or choose to emphasize different arguments in oral presentations to different judges[2] does not support an inference that the attorney's decision was based on having earlier made a particular argument in a telephone call. In the absence of any evidence that the controverted topic came up in the teleconference, we conclude that there is no reasonable possibility that any prejudice attached because of James' absence from the teleconference. Moreover, we find that admission of this evidence-evidence which James himself argued to the trial court had very low probative value-was harmless beyond a reasonable doubt, given the overwhelming proof of James' guilt.

## B. Agent Webb's Alleged Racial Bias.

■ Through Webb's testimony, the prosecution was able to establish that James had knowledge of bank security devices, and to provide evidence that James made inculpatory statements. Prior to offering Webb's testimony, the government moved to prevent the defense from impeaching Webb with a letter of reprimand he received for a 1983 incident involving an African–American FBI agent with whom Webb worked while stationed at the FBI's Omaha, Nebraska office. Apparently, Webb found it humorous that his fellow agent was taking scuba-diving lessons in Omaha, Nebraska. So, Webb obtained a mechanical scuba-diving toy, colored the face of the toy black, and left it on his colleague's desk. Because James is an African–American, defense counsel argued that he should

---

**1.** The restrictions precluded mentioning that the source of the information was James' father, that James had participated in two earlier bank robberies, and that James had been in custody.

**2.** An examination of the transcript of the conference before Judge Wilken shows that she was particularly interested in the *Miranda* issue.

be permitted to inquire into this incident to demonstrate Webb's racial bias. Noting that the incident was remote in time and involved no expression of racial animus toward any black defendant, the district judge concluded that evidence of the incident would "generate more heat than light" and would not assist the jury in evaluating Webb's testimony. Thus, pursuant to Fed.R.Evid. 403, the district court ruled that the letter of reprimand could not be used to impeach Webb.

■ The district court may impose reasonable limitations on cross-examination, which we will review for an abuse of discretion. *United States v. Dees,* 34 F.3d 838, 843 (9th Cir.1994). "Whether limitations on cross-examination are so severe as to amount to a violation of the confrontation clause is a question of law we review *de novo.*" *Id.*

■ We follow what we have described as a two-part inquiry to determine whether a criminal defendant's Sixth Amendment right to confront the witness against him has been violated by the exclusion of evidence. *Wood v. State of Alaska,* 957 F.2d 1544, 1549–50 (9th Cir.1992). First, we must inquire whether the excluded evidence is relevant. If the evidence is relevant, we must inquire whether there were other legitimate interests outweighing a party's interest in presenting the evidence. A closer reading of *Wood* shows that there is a third inquiry we must also make. We must determine whether the trial court's exclusion of evidence left the jury with " 'sufficient information' upon which to assess the credibility of witnesses." *Wood,* 957 F.2d at 1550 (quoting from *United States v. Kennedy,* 714 F.2d 968, 973 (9th Cir.1983)).

Fed.R.Evid. 401 provides that evidence is relevant if it has any tendency to make the existence of a fact that is of consequence more or less probable than it would be without the evidence. We conclude that the 1983 scuba-diving incident is relevant, because it is more probable that one who had engaged in such an incident is racially biased than one who had not.

Moving to the second step of the process, we begin by considering the probative value of the evidence. We find its probative value

to have been negligible for three reasons. First, in Webb's entire career, this appears to have been the only recorded incident that could even arguably demonstrate racial prejudice, a point which undermines, but does not foreclose, its characterization as significantly probative of racial animus. Second, although we recognize and deplore the persistence of racial prejudice in our society, a healthy society cannot see racism as the prime mover behind every comment or act which shows that one person is aware of another's race. Here, the underlying facts-scuba-diving lessons taken in landlocked Omaha-were the obvious focus of Webb's attempt at humor. Using a black painted face identified the scuba diver as Webb's colleague. The incident may be rather good evidence that Webb was insensitive to his co-worker's feelings, but it is considerably weaker evidence that Webb actually was prejudiced against African–Americans. Third, and most significant under the circumstances, even assuming that applying paint to the toy's face was more indicative of racial attitude than an effort to make the toy a representation of Webb's colleague, the fact that the incident occurred approximately twelve years before Webb's contact with James renders it too remote to be a meaningful demonstration of Webb's attitudes at the time he met James.

If the evidence had been admitted, of course, its admission would have invited rebuttal evidence about Webb's racial attitudes. In addition, admitting evidence of Webb's alleged prejudice against African–Americans would have made evidence concerning his relationship with James himself more important, rendering it less appropriate to exclude evidence of Webb's relationship with James, evidence the trial court thought should not be presented to the jury. Injecting the topic of racial prejudice into the trial, no matter how tenuous its role in the case really was, would have risked misleading and confusing the jury because of the provocative nature of the topic. Here, the negligible probative value of the scuba-diving incident was substantially outweighed by the danger that its admission would result in confusion of the issues and would mislead the jury.

Finally, we inquire whether there was enough evidence to assess Webb's credibility after exclusion of the scuba-diving incident. We believe that there was. Webb was subject to extensive cross examination, which established a variety of potential flaws in his testimony. Even so, James argues that where, as happened here, the trial court's decision excluded the *only* evidence of bias, as contrasted with cross-examination attacking credibility generally; we must reverse unless we are convinced beyond a reasonable doubt that the decision to exclude the evidence of bias was harmless. James cites *Delaware v. Van Arsdall,* 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) to support his position [3] James argues that Webb's testimony was crucial to his convictions, because impeachment of the tellers' testimony rendered that evidence suspect. We disagree. We do not find that any teller's testimony was significantly impeached. Our review of the record leaves us firmly convinced that, given the videotapes, photographs, teller testimony, and testimony by Baldridge, James would have been convicted if Webb had never set foot in the courtroom. It follows that exclusion of the scuba-diving incident was harmless beyond a reasonable doubt.[4]

C. The Vulnerable Victim.

■ A bank teller at one of the banks robbed by James was six months pregnant at the time of the offense. At sentencing the court considered the following statement James made to the pregnant teller during the robbery:

> Don't give me any of the trackers, alarms or magnets or I'll kill you. I notice that you are pregnant and I love children, but I will come back and kill you and the baby.

The district court found that James' threat to the pregnant woman warranted the adjustment applicable where there is an unusually vulnerable victim and imposed a two-level increase in his offense level, pursuant to U.S.S.G. § 3A1.1(b). The court stated:

> It may well be that if the teller was pregnant and there was no mention of that condition, that that might not fulfill the vulnerable victim circumstance. And when you take these express statements that "I see you're pregnant. If you don't do what I want, I will come back and kill you and the baby." I'm satisfied at that point that the teller became a vulnerable victim.

■ We review a district court's findings regarding the vulnerability of the victim for clear error. *United States v. Peters,* 962 F.2d 1410, 1416 (9th Cir.1992). In Peters, after noting that a finding of unusual vulnerability typically arises from consideration of the victim's age, mental condition, or physical condition, we added:

> The Guidelines do not, however, prescribe consideration of only those three factors. Section 3A1.1 goes on to ask if the defendant knew or should have known that a victim was "otherwise particularly susceptible to the criminal conduct." The addition of the "otherwise particularly susceptible" language requires the sentencing court to consider factors beyond the victim's age, physical and mental condition. The sentencing court must consider the characteristics of the defendant's chosen victim, the victim's reaction to the criminal conduct, and the circumstances surrounding the criminal act. The sentencing court must then determine whether the defendant could reasonably have anticipated the victim's reaction.

*Id.* at 1417 (citation omitted).

The district court did not classify the teller as unusually vulnerable simply because she was pregnant. However, her pregnancy created a potential vulnerability which James acknowledged and exploited when he expressly threatened to kill her unborn child.

---

3. Although we question whether *Van Arsdall* should be used to require reversal on the basis of the exclusion of evidence with such minimal probative value, we concede that because the scuba-diving incident was the *only* evidence of bias, there is textual support for James' position in *Van Arsdall.* We need not decide whether James' literalist reading of *Van Arsdall* is correct, however, because even assuming it to be correct, his argument fails on the facts here.

4. Because we find Webb's testimony to have been unnecessary to James' conviction on any of the counts, we need not address James' arguments that the court erred by admitting various portions of his testimony.

Under the circumstances presented, the finding that she was an unusually vulnerable victim is not clearly erroneous. James knew the teller was pregnant. He attempted to take advantage of the teller's pregnancy to frighten her and convince her to do what he wanted, and he succeeded. James told her not to give him any track money. Upon seeing additional money in her cash drawer, James asked her for it. The teller responded that she had not given it to him because it was track money, to which James replied, "Good girl." [5]

Regardless of the actual merit of the proposition that the teller was an unusually vulnerable victim, James seeks to avoid the upward adjustment on the grounds that the sentencing judge did not make adequate findings on the record when he imposed sentence on August 15, 1996. In particular, James points out that it was not until September 3, 1996, when the judge filed a memorandum elaborating his findings of fact, that he specifically stated that he had relied upon the teller's reaction to the threat to kill the unborn child.

James relies on *United States v. Fitzwater,* 896 F.2d 1009 (6th Cir.1990). In *Fitzwater,* the appellate court refused to consider a trial court's written explanation for its departure from the sentencing guidelines which had been filed four weeks after the date of the sentencing which was also the date that an appeal was taken. The *Fitzwater* court held that the district court had no jurisdiction to act after the appeal was taken. According to James, *Fitzwater* shows that we should not consider the September 3 memorandum in which Judge Quackenbush advised that he had relied on the teller's reaction to the threat to kill her child.

We do not know when the judgment was entered in *Fitzwater,* but in the instant case, the judgment was entered on September 3, 1996, the same day that the memorandum was filed. Although James did file his notice of appeal on August 15, 1996, the same day he was sentenced; under Fed. R.App. P. 4(b), his notice of appeal is considered to have been filed on the date the judgment was entered. Thus, the district court still had jurisdiction on September 3, 1996.[6] We also observe that filing the memorandum on September 3, 1996, did not hinder James' appeal or thwart our ability to review the district court's action. The September 3 memorandum is part of the record on appeal, and James addressed it in his briefing. We find no reason to foreclose consideration of the memorandum as an elaboration on the basis for the trial court's imposition of the adjustment for an unusually vulnerable victim in the context of this case.[7]

James' conviction and sentence are **AFFIRMED.**

---

5. James points out that after the robber left, the teller did activate the silent alarm. Unlike James, we do not see this as vitiating the significance of her decision not to give James the track money as evidence of the impact his threat had upon her. Rather, it tends to underscore just how effective the threat had been in preventing the one act that the robber might have discovered and been able to trace back to the pregnant teller.

6. The judgment was signed on September 2, 1996, but it was not actually entered until September 3, 1996.

7. We do not wish to encourage the substitution of post sentencing elaboration for contemporaneous recitation of the details supporting sentencing decisions. Such a practice risks eliminating the opportunity for meaningful argument before the sentencing court itself. However, that risk was not realized here. Before the court announced its decision on the vulnerable victim issue, the prosecutor had specifically argued that the teller's reaction constituted support for the upward adjustment, and after he had done so, Judge Quackenbush gave defense counsel an opportunity to respond.