# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
       *Plaintiff-Appellee,*

v.

PATRICIA ANN LARSON,
       *Defendant-Appellant.*

No. 05-30076

D.C. No.
CR-04-00110-SEH

UNITED STATES OF AMERICA,
       *Plaintiff-Appellee,*

v.

LEON NELS LAVERDURE,
       *Defendant-Appellant.*

No. 05-30077

D.C. No.
CR-04-00110-SEH

OPINION

Appeal from the United States District Court
for the District of Montana
Sam E. Haddon, District Judge, Presiding

Argued and Submitted
January 13, 2006—Portland, Oregon

Filed August 28, 2006

Before: Diarmuid F. O'Scannlain, Susan P. Graber, and
Carlos T. Bea, Circuit Judges.

Opinion by Judge O'Scannlain

10263

**COUNSEL**

David F. Ness, Assistant Federal Defender, Federal Defenders of Montana, Great Falls, Montana, argued the cause for defendant-appellant Larson; Anthony R. Gallagher, Federal Defender, District of Montana, was on the briefs. James B. Obie, Helena, Montana, argued the cause for defendant-appellant Laverdure and filed a brief.

Joseph E. Thaggard, Assistant United States Attorney, Great Falls, Montana, argued the cause for the plaintiff-appellee; William W. Mercer, United States Attorney, was on the brief.

**OPINION**

O'SCANNLAIN, Circuit Judge:

In these methamphetamine conspiracy conviction appeals, we must consider whether defense counsel was improperly prevented from cross-examining coconspirators about the prison sentences they would have received but for their cooperation with the government, and whether other trial rulings were proper.

I

A

Beginning in April 2003, police officers in Great Falls, Montana, investigated the possibility that Patricia Ann Larson and Leon Nels Laverdure were involved in a conspiracy to purchase and distribute methamphetamine.

The police first orchestrated a controlled purchase of methamphetamine from Larson by a paid informant, one Connie Riggs, who had met Larson "through some sort of party or some kind of drug interaction" and had known her for "a couple years." Riggs drove Larson to a house where Larson purchased approximately one sixteenth of an ounce of the drug (1.80 grams), which she then sold to Riggs.

The police later arranged for two controlled purchases of drugs from Laverdure by Jason Gilstrap, another confidential informant. One purchase involved 1.46 grams of methamphetamine, and the other involved 1.79 grams. The police also arranged for a confidential informant to purchase about 3.5 grams of methamphetamine from Joy Lynn Poitra and her cousin, Rick Lee Lamere. Lamere would later acknowledge receiving some of his methamphetamine from Laverdure. A second controlled purchase followed shortly after, at which time Poitra sold approximately 21 grams of methamphetamine to the informant.

B

On July 23, 2004, a federal grand jury filed indictments against Larson, Laverdure, Lamere, and Poitra, charging each with a single count: conspiracy to possess and distribute controlled substances, "including but not limited to 500 grams or more of a substance containing a detectable amount of

methamphetamine," in violation of 21 U.S.C. §§ 841(a)(1) and 846, between January 1, 1999, and February 29, 2004.[1]

Prior to trial, Poitra pleaded guilty under a superseding indictment charging her with conspiring to possess a controlled substance with intent to distribute at least 50 grams of a substance containing a detectable amount of methamphetamine. Conviction for the originally charged offense would have subjected Poitra to a term of imprisonment ranging from five to 40 years.

With respect to Lamere, the government had notified him of its intention to seek an enhanced sentence under 21 U.S.C. § 851 and, accordingly, Lamere allegedly would have faced a mandatory minimum penalty of life imprisonment. Lamere avoided the possibility of such enhancement by pleading guilty to the conspiracy charge and admitting to having distributed five kilograms of a substance containing methamphetamine.

Both Poitra and Lamere agreed to testify against Larson and Laverdure in exchange for the reduced charges.

C

The jury trial took place in Great Falls, Montana, before District Judge Sam E. Haddon, on October 26 and 27, 2004. Before any testimony was heard, Larson's attorney requested that the defendants be allowed to "sit at counsel table with us so that we can consult with them." The court denied the request.

---

[1]The indictment further alleged "the drug quantity attributable to Defendant Larson to be five kilograms to fifteen kilograms of a substance containing a detectable amount of methamphetamine and two to 3.5 kilograms of cocaine"; and "the drug quantity attributable to Defendant Laverdure to be five to fifteen kilograms of a substance containing a detectable amount of methamphetamine."

1

On the second day of trial proceedings, the prosecution elicited testimony from Poitra and Lamere. On the witness stand, both Poitra and Lamere admitted to cooperating with the government with the expectation of receiving a reduced sentence.

On direct examination, Poitra testified that she had obtained methamphetamine from Laverdure and that, on one or two occasions, she had overheard phone calls during which Laverdure would ask for "Patty" (i.e., Larson). Poitra said that Laverdure would then travel to Larson's house to obtain the drugs. As to the controlled purchase which resulted in her arrest, Poitra testified that she had obtained the methamphetamine from Larson through Laverdure.

On cross-examination, counsel for Larson attempted to inquire about the likely prison term Poitra was facing absent her cooperation with the government. Judge Haddon sustained an objection by the prosecution and instructed the jury that the term of imprisonment was a decision for the court alone. Counsel was permitted to ask Poitra about the possibility of imprisonment, but not about her understanding of the particular term she was likely to receive. Counsel was also able to cross-examine Poitra as to inconsistencies among the statements given to police in the course of three prior interviews. Poitra admitted to extensive drug use and to drug dealing. Finally, defense counsel cross-examined Poitra as to whether the plea agreement included a promise of a reduced sentence contingent upon her testimony at trial; Poitra acknowledged her understanding that the only person who could move to reduce her sentence was the Assistant United States Attorney.

On direct examination of Lamere, the prosecution elicited testimony that Lamere had obtained methamphetamine from Larson through Laverdure. Lamere knew this to have been the case because, he said, Laverdure had told him it came from

Larson. Lamere also testified that one "Fatso" Komeotis claimed to have obtained six ounces of methamphetamine from Larson, which he had then passed on to Lamere. The district court overruled two hearsay objections by defense counsel.

On cross-examination, defense counsel, as it did when examining Poitra, elicited testimony from Lamere that he was testifying pursuant to a plea bargain under which he expected the government to move for a reduced sentence.

2

The jury rendered guilty verdicts against Larson and Laverdure.[2] On February 14, 2005, the district court sentenced Larson to a 97-month term of imprisonment to be followed by a four-year term of supervised release. On the same day, the court sentenced Laverdure to a 188-month term of imprisonment to be followed by a four-year term of supervised release.

II

Larson and Laverdure's first contention on appeal is that the district court violated their Confrontation Clause rights when it prevented counsel from cross-examining the government's cooperating witnesses as to the minimum terms of imprisonment they would likely have faced if not for their agreement to testify against the appellants.[3]

---

[2]The jury also rendered "special verdicts" finding the "amount of drugs attributable to . . . Larson, to be 309 grams of a substance containing a detectable amount of methamphetamine," and the "amount of drugs attributable to . . . Laverdure to be 364 grams of a substance containing a detectable amount of methamphetamine."

[3]With respect to our standard of review, there is a certain lack of clarity in our prior Sixth Amendment jurisprudence. In some cases we have reviewed de novo whether limitations on cross-examination are so severe as to violate the Confrontation Clause. *See United States v. Adamson*, 291

More specifically, Larson and Laverdure argue that the government's case against them "was based almost entirely on the testimony of Poitra and LaMere [sic] . . . . Their credibility was, therefore, critical to the case." Citing *Delaware v. Van Arsdall*, 475 U.S. 673 (1986), they further contend that but for the trial court's limitation on cross-examination, the jury likely would have received a "significantly different impression" of the witness's credibility.

The government's position is that the extent of cross-examination permitted was sufficient to pass constitutional muster and, if not, any error was harmless beyond reasonable doubt.

## A

**[1]** The right to confrontation enshrined in the Sixth Amendment includes the right to cross-examine adverse witnesses. *Davis v. Alaska*, 415 U.S. 308, 315-17 (1974). This right, in turn, ensures a defendant's opportunity to demonstrate any possible bias in the adverse witness as well as his

---

F.3d 606, 612 (9th Cir. 2002); *United States v. Ortega*, 203 F.3d 675, 682 (9th Cir. 2000); *United States v. Beardslee*, 197 F.3d 378, 383 (9th Cir. 1999). Yet in another line of cases, we have applied an abuse of discretion standard. *See Wood v. Alaska*, 957 F.2d 1544, 1550 (9th Cir. 1992); *United States v. Lo*, 231 F.3d 471, 482 (9th Cir. 2000); *United States v. Feldman*, 788 F.2d 544, 554 (9th Cir. 1986). This is not the first occasion on which we have noted the discrepancy. *See United States v. Rodriguez-Rodriguez*, 393 F.3d 849, 856 (9th Cir. 2005).

However, as was the case in *Rodriguez-Rodriguez*, we need not render a definitive holding as to the proper standard of review of this sort of Confrontation Clause claim if reversal is unwarranted under any standard. *See id.* Moreover, the substantive Confrontation Clause standard, as we discuss further below, itself prescribes deference to the trial court's decisions. *See, e.g.*, *United States v. Jenkins*, 884 F.2d 433, 435 (9th Cir. 1989).

We also note that we may affirm the decision below on any ground supported by the record, even if it differs from the reasoning of the district court. *Padilla v. Terhune*, 309 F.3d 614, 618 (9th Cir. 2002).

motivation for testifying. *Id.* at 316-17 ("The partiality of a witness is . . . 'always relevant as discrediting the witness and affecting the weight of his testimony.' " (quoting 3A J. Wigmore, Evidence § 940, at 775 (Chadbourne rev. 1970))).

**[2]** A Confrontation Clause violation occurs where the defendant is prevented from investigating "a prototypical form of bias" if the jury "might reasonably have found [that it] furnished the witness a motive for favoring the prosecution in his testimony." *Van Arsdall*, 475 U.S. at 679-80. Accordingly, the cross-examination need not be certain to affect the jury's assessment of the testimony. *Fowler v. Sacramento County Sheriff's Dep't*, 421 F.3d 1027, 1036 (9th Cir. 2005). Additionally, limitations on cross-examination "cannot preclude a defendant from . . . [making] 'a record from which to argue *why* [the witness] might have been biased.' " *United States v. Schoneberg*, 396 F.3d 1036, 1042 (9th Cir. 2005) (quoting *Davis*, 415 U.S. at 318 (first alteration added)).

But the right to cross-examine a witness for possible bias or incredibility is not absolute or unlimited. In *Van Arsdall*, the Supreme Court insisted that a trial court retains "wide latitude" to exclude cross-examination that is, among other things, harassing, prejudicial, confusing of the issues, threatening to the witness's safety, repetitive, or only marginally relevant. 475 U.S. at 679. " '[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.' " *Id.* (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (per curiam)).

Moreover, in prior cases we have explained that, although the trial court cannot foreclose *all* inquiry into an otherwise proper area of cross-examination, it may impose limitations on cross-examination that are "reasonable" and not "arbitrary or disproportionate to the purposes they are designed to serve." *See, e.g.*, *Fowler*, 421 F.3d at 1037 (quoting *Van Ars-*

*dall*, 475 U.S. at 679; and *Michigan v. Lucas*, 500 U.S. 145, 151 (1991) (internal quotation marks omitted)).

More specifically, the trial court does not err " 'as long as the jury receives sufficient information to appraise the biases and motivations of the witness.' " *United States v. Shabani*, 48 F.3d 401, 403 (9th Cir. 1995) (quoting *United States v. Feldman*, 788 F.2d 544, 554 (9th Cir. 1986)). On this point, the First Circuit's formulation is apt: a trial court need allow only a "minimal constitutional threshold level of inquiry," and it does not err provided that "there is sufficient evidence before the jury (absent the excluded evidence) from which the jury could make a discriminating appraisal of the possible biases and motivations of the witnesses." *United States v. Luciano-Mosquera*, 63 F.3d 1142, 1153 (1st Cir. 1995) (internal quotation marks omitted); *accord Wood*, 957 F.2d at 1550 (holding that the jury need have only " 'sufficient information' upon which to assess the credibility of witnesses").

B

**[3]** Accordingly, in this Circuit, we have distilled from the foregoing cases three criteria under which we will evaluate a claim that the trial court has violated the Confrontation Clause by excluding evidence: (1) whether the excluded evidence was relevant; (2) whether there were other legitimate interests outweighing the defendant's interest in presenting the evidence; and (3) whether the exclusion of evidence left the jury with sufficient information to assess the credibility of the witness. *See Beardslee*, 197 F.3d at 383 (citing *United States v. James*, 139 F.3d 709, 713 (9th Cir. 1998)). We apply these criteria to the present case.

1

**[4]** The parties do not specifically contest the potential relevance of the excluded cross-examination. All else being equal, we consider it more probable that a cooperating witness

otherwise facing a lengthy prison sentence will give testimony biased in the government's favor. *Cf. James*, 139 F.3d at 713 (citing Fed. R. Evid. 401).

2

As for the second criterion, "we begin by considering the probative value of the evidence." *Id.* As noted above, the defense sought to elicit testimony that, but for their cooperation, Poitra and Lamere were facing mandatory minimum sentences of five years and life, respectively.

**[5]** The five-year mandatory minimum faced by Poitra was of slight probative value. For an offense involving the sale of narcotics, a five-year sentence is not particularly lengthy; the jury likely assumed that Poitra's sentencing exposure was at least that extensive without being specifically told so. Lamere's exposure to a statutory life sentence has greater probative value. We note, however, that the potential for biased or false testimony depends not only on the likely sentence the witness would otherwise face, but also—and more directly—on the *reduction* in sentencing he or she expects to receive. A cooperating witness's motivation to give biased or false testimony is therefore not necessarily captured by the length of the potential sentence—the witness knows that his sentencing remains subject to the court's discretion notwithstanding the government's motion. Lamere's sentencing had not yet taken place at the time he testified against Larson and Laverdure.

**[6]** We must also consider whether the excluded cross-examination may have been prejudicial. *See United States v. Easter*, 66 F.3d 1018, 1022 (9th Cir. 1995). Larson and Laverdure sought to elicit testimony on cross-examination of Poitra and Lamere that "would [have] place[d] before the jury information from which it could infer the potential sentences the appellants faced and that could sway the jury." *United States v. Arocho*, 305 F.3d 627, 636 (7th Cir. 2002), *superseded by statute on other grounds as stated in United States*

*v. Rodriguez-Cardenas*, 362 F.3d 958, 960 (7th Cir. 2004); *accord United States v. Mulinelli-Navas*, 111 F.3d 983, 988 (1st Cir. 1997); *Luciano-Mosquera*, 63 F.3d at 1153. Where, as here, the defendants and cooperating witnesses were charged as members of a single conspiracy, we consider that danger especially troublesome. Moreover, we note that the severity of the potential prejudice is likely commensurate with the length of the prison term the cooperating witness may have received. The inference (stemming from Lamere's potential sentence) that Larson and Laverdure could be sentenced to life in prison may have strongly biased the jury against conviction.

3

Lastly, we consider whether the jury was left with sufficient other information to assess the credibility of Poitra and Lamere.

**[7]** In this case, it is clear that the district court did not foreclose *"all* inquiry" into the motivation for the cooperating witnesses' testimony. *Van Arsdall*, 475 U.S. at 679. On cross-examination of Poitra, Larson's attorney inquired about the plea agreement Poitra had reached with the government. He asked whether Poitra "was going to prison because of" the admissions in the plea agreement, to which Poitra responded affirmatively. Counsel then asked, "In fact, you're going to prison for a minimum of five years; right?" Judge Haddon then interjected, "Well, just a minute counsel. You know that the sentencing of defendants in this court is the responsibility of the court. And I will make the decision about the appropriate sentence at the appropriate time. That's not a proper subject of cross-examination." Counsel again attempted to ask Poitra about her "understanding of the penalty [she was] facing." Judge Haddon sustained the government's second objection.

However, Larson's trial counsel persisted, next asking, "Your understanding is, short of your cooperation, you're

likely to go to prison; correct?" Poitra answered affirmatively, and the following exchange ensued:

Q. And you have a new baby, right?

A. He's two years old.

Q. And obviously, you don't want to go to prison and leave your baby; do you?

A. No.

Q. And you also know that there's only one person in this courtroom that can even make a motion to try to reduce your sentence; correct?

A. Yes.

Q. And that's Mr. Thaggard [the Assistant U.S. Attorney]; correct?

A. Yes.

. . . .

Q. And so in a very real sense, your sentence is directly affected by your testimony here?

A. Yes.

Defense counsel was able to question Lamere along similar lines. Lamere testified that by his testimony against Larson and Laverdure he hoped for the government's motion to reduce his prison sentence. He further acknowledged that the government prosecutor was the only person who could make the motion for the reduced sentence.[4]

---

[4]The jury heard this testimony after the court's admonition to defense counsel that sentencing "is the responsibility of the court." We are satisfied that the jury understood that the Assistant U.S. Attorney's motion was required to reduce Poitra and Lamere's sentences.

**[8]** In *United States v. Dadanian*, 818 F.2d 1443 (9th Cir. 1987), *modified on other grounds*, 856 F.2d 1391 (9th Cir. 1988), we rejected a claim that the district court violated the Sixth Amendment when it "fail[ed] to allow cross examination of [a cooperating witness] about his maximum jail time exposure." 818 F.2d at 1449. The court explained that *Van Arsdall* was not violated because the witness "was subject to extensive cross examination about the terms of his agreement with the government," including questioning about an agreement to dismiss nine mail fraud counts and illegal gambling and racketeering charges in exchange for his testimony. *Id.* This constituted "more than an adequate opportunity to expose [the witness's] potential bias and motive in testifying," and thus the prison time the witness faced was "at best marginally relevant." *Id.*

The cross-examination permitted in this case was quite similar to that which we deemed sufficient in *Dadanian*. Larson and Laverdue, however, would have us distinguish that case. They contend that in *Dadanian* the defense sought to inquire into the penalties that a defendant "might" have faced (the statutory maximum sentence), whereas in this case counsel attempted to cross-examine Poitra and Lamere as to the sentences they "would" otherwise face (the statutory minimum sentences). They think the latter is more nearly relevant to a showing of potential bias.

**[9]** However, we do not read *Dadanian* as suggesting that our inquiry should turn on the length or certainty of the sentence about which defense counsel sought to inquire. Rather, in *Dadanian* we considered whether the trial court foreclosed "*all* inquiry" into a prototypical form of bias or merely imposed limitations that are reasonable and not arbitrary or disproportionate to the purposes served. Where the court allows extensive examination as to the existence of an agreement by which a witness has traded adverse testimony for the government's motion for a reduced sentence, the defense has provided the jury with sufficient information upon which to

judge the witness's motivation for testifying and his or her corresponding credibility. The length of the sentence the cooperating witness would otherwise face—even where certain because of an applicable statutory minimum—is marginally relevant in light of testimony about the existence of an agreement generally. Such evidence may be excluded at least where, as here, the jury may have improperly inferred that the defendants faced sentences of similar duration.

Our holding is consistent with the opinions of several other circuits, which considered and rejected similar Sixth Amendment challenges. *See Arocho*, 305 F.3d at 636 (holding that where the jury heard about the witnesses' plea agreements, that multiple counts were dismissed in exchange for testimony, and that the witnesses expected to receive a substantial benefit, the trial court did not violate the Confrontation Clause by excluding cross-examination as to the "specific sentences and the sentencing guideline ranges they faced both before and after their cooperation with the government"); *Mulinelli-Navas*, 111 F.3d at 987-88 (holding that the district court did not violate the Confrontation Clause where it excluded cross-examination as to the possible sentence faced by the cooperating witness because the defense was able to elicit testimony as to the government's agreement to drop charges against him and that the U.S. Attorney would make a recommendation for reduction in his sentence; district court had reasoned that "matters of sentencing were in the sound discretion of the district court judge"); *Luciano-Mosquera*, 63 F.3d at 1153 (holding that the district court did not violate the Confrontation Clause when it cut off cross-examination into the 35-year penalty a government witness would have faced on counts that were dropped in exchange for his testimony; the defendant had "sufficient opportunity to expose potential biases" and "[a]ny probative value of information about the precise number of years [the witness] would have faced . . . was slight"); *United States v. Nelson*, 39 F.3d 705, 707-09 (7th Cir. 1994) (holding that the court reasonably limited cross-examination where it "prevented defense counsel from asking

[the witnesses] what penalties they might have faced without plea-bargains" where the jury heard about the plea bargains and about "what the witnesses were to receive from the bargains"; "once this core function is satisfied by allowing cross-examination to expose a motive to lie, it is of peripheral concern to the Sixth Amendment how much opportunity defense counsel gets to hammer that point home to the jury"); *Brown v. Powell*, 975 F.2d 1, 3-6 (1st Cir. 1992) (holding that the trial court did not violate the defendant's Sixth Amendment rights when it excluded testimony that a cooperating witness had avoided the possibility of a life sentence without parole in exchange for his testimony; the jury had sufficient other information before it to apprise possible biases and motivations).[5]

In sum, Poitra and Lamere were "subject to extensive cross examination, which established a variety of potential flaws in [their] testimony." *James*, 139 F.3d at 714; *accord Easter*, 66 F.3d at 1022. We are satisfied, in light of the district court's "wide latitude" on such matters, that the jury received adequate information with which to appraise the biases and motivations of the cooperating coconspirators.

## C

**[10]** Having considered the foregoing factors, we reject Larson and Laverdure's claim that the district court's limita-

---

[5]Decisions of this circuit in which the court found a Confrontation Clause violation are distinguishable from the present case. For example, *Schoneberg* involved circumstances in which defense counsel "was not permitted to cross examine [the witness] about whether his testimony was affected by the government's promise to move for a sentence reduction if his testimony satisfied the government." 396 F.3d at 1040-41. Here, Larson and Laverdure clearly had the opportunity "to make clear to the jury what benefit or detriment will flow [from Poitra and Lamere's testimony], and what will trigger the benefit or detriment, to show why the witness might testify falsely in order to gain the benefit or avoid the detriment." *Id.* at 1042.

tion on cross-examination of adverse witnesses violated their Confrontation Clause rights. Poitra's five-year minimum was of slight probative value. With respect to Lamere's potential life sentence in particular, there was a significant danger of undue prejudice from counsel's intended line of cross-examination. And as to each in equal measure, the jury otherwise received sufficient information from which to evaluate the cooperating witness's biases and motivations.

## III

Next, Larson and Laverdure contend that the district court erred when it admitted, over counsel's objection, Lamere's testimony that Laverdure and "Fatso" Komeotis told him that Larson was the source of their methamphetamine. Larson and Laverdure frame this objection as violating the Federal Rules of Evidence, as well as the Sixth Amendment.[6]

## A

Larson and Laverdure first contend that Lamere's testimony was hearsay. They argue that, although the coconspirator-statement rule may encompass statements that aid in the initiation of the conspiracy or those that "help plan future strategy," *see* FED. R. EVID. 801(d)(2)(E), the rule does not permit the introduction of the statements at issue, which they consider merely "chit chat, bragging, or descriptive comments," and, in any event, that there was inadequate foundation here to support admission under Rule 801(d)(2)(E).

---

[6]We review de novo the district court's application of the hearsay rule. *United States v. Alvarez*, 358 F.3d 1194, 1214 (9th Cir. 2004). However, we apply a clearly erroneous standard in reviewing whether challenged statements were made in the course and furtherance of a conspiracy. *United States v. Pena-Espinoza*, 47 F.3d 356, 360-61 (9th Cir. 1995); *United States v. Shryock*, 342 F.3d 948, 981 (9th Cir. 2003).

We review de novo whether the admission of an out-of-course statement violated the Confrontation Clause. *United States v. Bowman*, 215 F.3d 951, 960 (9th Cir. 2000).

The government's position is that Laverdure and Komeotis's statements were made during the course and in furtherance of a conspiracy.

1

**[11]** A coconspirator's statement may be admitted against a defendant where the prosecution shows by preponderance of the evidence that (1) the conspiracy existed when the statement was made; (2) the defendant had knowledge of, and participated in, the conspiracy; and (3) the statement was made "in furtherance of" the conspiracy. *Bowman*, 215 F.3d at 960-61 (citing *Bourjaily v. United States*, 483 U.S. 171, 175 (1987)).[7] In general, it is true that "[m]ere conversations between coconspirators, or merely narrative declarations among them, are not made 'in furtherance' of a conspiracy. Rather, to be 'in furtherance' the statements must further the common objectives of the conspiracy or set in motion transactions that are an integral part of the conspiracy." *United States v. arbrough*, 852 F.2d 1522, 1535 (9th Cir. 1988) (citations omitted).

**[12]** In prior cases we have considered a coconspirator's identification of the defendant as the source of illegal drugs as having been made "in furtherance of" the conspiracy. *See Williams*, 989 F.2d at 1068-69; *United States v. Paris*, 827 F.2d 395, 400 (9th Cir. 1987). The broad context or circumstances in which the statement was made can serve as foundation adequate to establish the purpose of such identification. Moreover, the foundation need be sufficient only to *infer* the statement's purpose; it need not be laid bare on the pages of the trial transcript. *See United States v. Layton*, 720 F.2d 548, 557 (9th Cir. 1983) ("The context of [the coconspirator's] statements supports an inference that they were made in furtherance of the conspiracy.").

---

[7]Komeotis need not have been indicted to be considered a coconspirator for the purposes of Rule 801(d)(2)(E). *United States v. Williams*, 989 F.2d 1061, 1067 (9th Cir. 1993).

In *Yarbrough*, we considered the admission of testimony that the declarant-coconspirator had conveyed details of past criminal acts committed by members of an alleged conspiracy. *See* 852 F.2d at 1535 (involving, for example, reports of certain murders committed by conspiracy members). With no specific discussion as to "foundation," the court treated the statements as clearly having been made "with the intent to keep [the] coconspirators abreast of what the [group] had done, was doing, or would do in the future." *Id.* at 1536; *accord United States v. Eaglin*, 571 F.2d 1069, 1083 (9th Cir. 1977). The coconspirator was relaying facts as to what steps had been taken in furtherance of the conspiracy's ultimate goal.

Similarly, in *Williams*, we considered out-of-court statements identifying the defendant as the source of drugs and held that the statements could be admitted under Rule 801(d)(2)(E). 989 F.2d at 1067-69. Larson and Laverdure read *Williams* as involving statements that "were made to 'set in motion a transaction that is an integral part of the conspiracy.' " We disagree. In *Williams* we held simply that the statements concerning drug source—as opposed to other statements which involved a coconspirator's request to buy drugs—were "clearly designed to keep [the coconspirator] informed as to the conspiracy's activities." *Id.* at 1068; *see also id.* at 1069 (holding that four other statements also "served to keep [a coconspirator] informed as to the group's drug supply").

We also find helpful our holding in *Pena-Espinoza*. In that case, a special agent testified that, while attempting to make a controlled purchase of narcotics, he asked a coconspirator "where the stuff came from, referring to the cocaine that [he] bought yesterday." 47 F.3d at 361. The court admitted testimony as to the coconspirator's answer that the defendant was the source of the drugs. The testimony as to the coconspirator's statement was not connected to any explicit foundational evidence as to *why* the declarant made the statement. *See id.*

Instead, we relied on "other evidence in the record," such as "a drug courier's several visits to [the defendant's] house just prior to making deliveries, and the defendant's presence during one of [the special agent's] drug purchases." *Id.* Thus, the defendant's status as a coconspirator was sufficient to establish the statements' relevance to him and the manner in which it furthered the conspiracy's purpose.

2

**[13]** In light of the foregoing cases, and given the context in which Laverdure and Komeotis made the statements at issue in this case, we easily infer several ways in which they furthered the objectives of the conspiracy. Most clearly, the statements by Laverdure and Komeotis kept Lamere abreast of the activities of the conspiracy. As in *Yarbrough*, the statements informed Lamere of certain steps taken in the process of reaching the ultimate goal of distribution of the methamphetamine. As in *Williams*, the statements served to keep Lamere informed as to the group's drug supply. And as in *Pena-Espinoza*, Lamere's status as a member of the conspiracy and the specific factual context in which the statements were made—during purchases of illegal narcotics—provide adequate foundation to infer the purpose of those statements.[8] As the government suggests, the statements likely provided assurance to Lamere "that he would receive methamphetamine from a source of supply known to him." Given the danger of the endeavor, Lamere may also have been interested to know precisely with whom he was dealing.[9]

---

[8]As the prosecution pointed out at trial, "We're looking at a business here. And basically [Komeotis] and Laverdure were identifying their supplier. And I think that that is highly relevant and it does pertain to the conspiracy and tends to advance it."

[9]To be sure, a supplier's informing a potential buyer as to the ultimate source of the illegal narcotics offered for the latter's purchase is not a "mere conversation between conspirators" nor simply a "narrative declaration." *United States v. Fielding*, 645 F.2d 719, 726 (9th Cir. 1981) (per

**[14]** For all of the foregoing reasons, the district court did not commit clear error in admitting under Rule 801(d)(2)(E) the out-of-court statements of Komeotis and Laverdure. As such, the evidence was validly admitted against both Larson and Laverdure. *See United States v. Eubanks*, 591 F.2d 513, 519 (9th Cir. 1979) (per curiam).

B

We next consider Larson and Laverdure's claim that admission of the out-of-court statements violated the Confrontation Clause.[10]

**[15]** The Supreme Court's recent decision in *Crawford v. Washington*, 541 U.S. 36 (2004), directs us to consider whether the admitted out-of-court statements were "testimonial." As other circuits have done, we recognize that "*Crawford* at least suggests that the determinative factor in determining whether a declarant bears testimony is the declarant's awareness or expectation that his or her statements may later be used at a trial."[11] *United States v. Saget*, 377 F.3d 223, 228

---

curiam). It is not a "casual admission of culpability to someone he had individually decided to trust." *United States v. Moore*, 522 F.2d 1068, 1077 (9th Cir. 1975) (involving a statement by a coconspirator to a person unrelated to the conspiracy). And this is not a case in which the coconspirator had "limited responsibilities" in the enterprise such that the declarant's statement was "immaterial to him." *United States v. Bibbero*, 749 F.2d 581, 584 (9th Cir. 1984).

[10]The government argues that the court could affirm the admission of Laverdure's out-of-court statement against Laverdure as an admission by a party opponent. But if the statement were not the statement by a coconspirator, most likely *Bruton v. United States*, 391 U.S. 123 (1968), and its progeny bar its use in the joint-trial setting.

[11]*See also White v. Illinois*, 502 U.S. 346, 365 (1992) (Thomas, J., concurring in part) ("[T]he Confrontation Clause is implicated by extrajudicial statements only insofar as they are contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions."), *quoted in Crawford*, 541 U.S. at 51-52.

(2d Cir. 2004); *accord United States v. Hinton*, 423 F.3d 355, 359 (3d Cir. 2005). The *Crawford* Court itself assumed that statements made in furtherance of a conspiracy "by their nature [are] not testimonial." 541 U.S. at 56; *accord United States v. Sanchez-Berrios*, 424 F.3d 65, 75 (1st Cir. 2005); *United States v. Lee*, 374 F.3d 637, 644 (8th Cir. 2004).

**[16]** Given our holding above, the out-of-court statements were clearly not testimonial in nature. It is unclear whether we are still required to apply the test articulated in *Ohio v. Roberts*, 448 U.S. 56 (1980), to determine the admissibility of such non-testimonial statements. *See United States v. Weiland*, 420 F.3d 1062, 1076 (9th Cir. 2005) (stating that there is "uncertainty" as to whether the *Ohio v. Roberts* test survives *Crawford*), *cert. denied*, 126 S. Ct. 1911 (2006); *see also Jensen v. Pliler*, 439 F.3d 1086, 1090 (9th Cir. 2006) (refusing to decide the issue), *petition for cert. filed*, ___ U.S.L.W. ___ (U.S. July 18, 2006) (No. 06-5449).

In *Roberts*, the Supreme Court held that the admission of an out-of-court declaration in a criminal trial requires adequate "indicia of reliability." 448 U.S. at 66. The Court cited two circumstances under which such indicia are established: (1) where admitted under a "firmly rooted hearsay exception"; or (2) where accompanied by "particularized guarantees of trustworthiness." *Id.* Later, in *Bourjaily v. United States*, the Court held that "the co-conspirator exception to the hearsay rule is firmly enough rooted in our jurisprudence that . . . a court need not independently inquire into the reliability of such statements." 483 U.S. at 183-84. Thus, the *Bourjaily* Court rendered the Sixth Amendment requirements for admitting coconspirator statements "identical" to those of Rule 801(d)(2)(E). *Id.* at 182-84.

**[17]** The admission of the out-of-court statements was proper under Rule 801(d)(2)(E). As such, even if *Roberts* survives *Crawford*, we hold that the Constitution was not violated. *See United States v. Hagege*, 437 F.3d 943, 958 (9th

Cir. 2006) (applying similar analysis), *petition for cert. filed*, 74 U.S.L.W. 3687 (U.S. May 23, 2006) (No. 05-1534).[12]

IV

Larson and Laverdure also contend that the district court violated their constitutional rights to a fair trial and due process when it denied a request that the court seat them at the counsel table, instead seating them directly behind their attorneys. They argue that the arrangement "adversely affect[ed] counsel's ability to communicate with his client during the trial," and that it "served to undermine the presumption of innocence" by injecting unnecessary and undue prejudice in the trial proceedings.[13]

A

**[18]** The criminal process presumes that the defendant is innocent until proved guilty. *Deck v. Missouri*, 544 U.S. 622, 630 (2005); *see also Estelle v. Williams*, 425 U.S. 501, 503 (1976) (explaining that the presumption is a basic component of the right to a fair trial). Accordingly, the Constitution prohibits any courtroom arrangement or procedure that "undermines the presumption of innocence and the related fairness of the factfinding process." *Deck*, 544 U.S. at 630 (citing *Williams*, 425 U.S. at 503). The presumption is so undermined

---

[12]Admission under the coconspirator exception similarly alleviates any difficulty under *Bruton* and its progeny. *See* 391 U.S. at 128 & n.3; *accord Sanchez-Berrios*, 424 F.3d at 76; *Eaglin*, 571 F.2d at 1078.

[13]At oral argument, counsel for Laverdure argued that the constitutional error stemmed from the combined effect of the seating arrangement and the proximity of federal marshals. The complaint about the marshals' presence, however, was raised for the first time at oral argument. It was not argued in the briefs, nor was there even any mention of it in the trial record. We consider it waived. *See Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 919 (9th Cir. 2001) ("[I]ssues which are not specifically and distinctly argued and raised in a party's opening brief are waived.").

when the practice creates "an unacceptable risk . . . of impermissible factors coming into play." *Williams*, 425 U.S. at 505.

1

The courts have invalidated various courtroom arrangements and procedures as violating the right to a fair trial. *See Deck*, 544 U.S. at 632-35 (invalidating the routine practice of compelling defendants during the punishment phase of capital cases to wear visible shackles); *Williams*, 425 U.S. at 503-05 (invalidating the trial court's requirement that a defendant appear in prison garb); *Musladin v. LaMarque*, 427 F.3d 653, 656-60 (9th Cir. 2005) (reversing a murder conviction because spectators wore buttons depicting the alleged victim's photograph), *cert. granted sub nom. Carey v. Musladin*, 126 S. Ct. 1769 (2006); *United States v. Olvera*, 30 F.3d 1195, 1198 (9th Cir. 1994) (reversing a conviction because the defendant was compelled to speak the words of the bank robber in front of the jury); *Norris v. Risley*, 918 F.2d 828, 831-34 (9th Cir. 1990) (reversing a rape conviction because spectators wore anti-rape buttons).

In contrast, the Supreme Court has upheld an arrangement by which four uniformed security personnel sat in the first row of the courtroom's spectator section. *See Holbrook v. Flynn*, 475 U.S. 560 (1986). The Court explained that the deployment of security personnel is not "the sort of inherently prejudicial practice that, like shackling, should be permitted only where justified by an essential state interest specific to each trial." *Id.* at 568-69. Similarly, in *Morgan v. Aispuro*, 946 F.2d 1462 (9th Cir. 1991), we held that the use of a courtroom with special security features "did not 'brand [the defendant] in [the jury's] eyes with an unmistakable mark of guilt.' " *Id.* at 1465 (quoting *Flynn*, 475 U.S. at 571). And in *Williams v. Woodford*, 384 F.3d 567 (9th Cir. 2004), we held that the "noticeable deployment" of four deputy marshals— "one near Williams, one near the jury, and one on each side of the gate from the spectator section"—was not inherently

prejudicial, and we declined to remand to the district court for an evidentiary hearing on the issue. *Id.* at 587-89.

The foregoing cases demonstrate that our core concern in this area is to avoid any procedure that undermines the presumption of innocence by conveying a message to the jury that the defendant is guilty. *See Flynn*, 475 U.S. at 567 (explaining that guilt is not to be determined on "grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial" (internal quotation marks omitted)); *Williams*, 425 U.S. at 503 ("[C]ourts must carefully guard against dilution of the principle that guilt is to be established by probative evidence and beyond a reasonable doubt."); *Rhoden v. Rowland*, 172 F.3d 633, 636 (9th Cir. 1999) (barring practices "creating an inherent danger that the jury may form the impression that the defendant is dangerous or untrustworthy . . . so as not to mark him as an obviously bad man or to suggest that the fact of his guilt is a foregone conclusion" (internal quotation marks omitted)); *Olvera*, 30 F.3d at 1197 (explaining that a trial practice cannot "isolate[ ] the defendant from all others in a courtroom [nor] inevitably *associate*[ ] *him or her with the charged conduct*" (emphasis added)); *Norris*, 918 F.2d at 831 (holding that the invalidated practice "constituted a continuing reminder that various spectators believed [the defendant's] guilt before it was proven").

2

While shackling and prison garb subtly suggest that the defendant should be imprisoned, and while buttons worn by spectators directly advocate for that result, the courtroom procedure employed in this case is different. As with the uniformed security guards in *Flynn*, the jury may not have even thought it remarkable that the two defendants were seated immediately behind their attorneys. The jury most likely "drew no impermissible inference" from the arrangement. *Musladin*, 427 F.3d at 657 (citing *Flynn*, 475 U.S. at 569).

**[19]** Given that the trial involved two defendants and the participation of two attorneys, the jury may have just as easily inferred that the arrangement simply ameliorated overcrowding at the counsel table, or that it facilitated a more orderly and decorous courtroom. We are confident that the seating arrangement was simply "taken for granted," and it surely carried a "wider range of inferences that a juror might reasonably draw." *Flynn*, 475 U.S. at 569. In short, the arrangement in no way conveyed a message of Larson and Laverdure's guilt and it therefore cannot be considered either "inherently prejudicial" or prejudicial in this particular case. *See id.*

We note the agreement of the First Circuit, which, in *United States v. Balsam*, 203 F.3d 72 (1st Cir. 2000), concluded that a similar seating arrangement did not cause prejudice by suggesting the defendant's guilt. The court approved a district court's decision, based on "the small courtroom and the attendant security concerns," to seat the defendants in the front row of the spectator section. *Id.* at 81-82. The First Circuit court noted that courtroom seating arrangements depend on "such a variety of factors" that it would afford substantial deference to the trial court's decision. It concluded that "[t]he front row in the spectator section is not an inherently prejudicial location for seating criminal defendants." *Id.*[14]

**[20]** Given that the seating arrangement in this case was not "inherently prejudicial," the district court need not have "justified [the arrangement] by an essential state interest specific to [Larson and Laverdure's] trial." *Flynn*, 475 U.S. at 568-69; *Morgan*, 946 F.2d at 1465 (holding that where a procedure is not inherently prejudicial "the state does not have to justify its decision" to employ that procedure). *But see United States v. Sorrentino*, 726 F.2d 876, 887 (1st Cir. 1984) (holding that

---

[14]The factual difference between *Balsam* and this case is not significant. Though *Balsam* involved five defendants, deference is nonetheless due the trial court's opting for alternative seating arrangements, based on similar concerns for courtroom security, for the two defendants at issue here.

the district court must articulate reasons of security or practicality).[15]

## B

Larson and Laverdure also suggest that the seating arrangement violated another constitutional value: a defendant's right

---

[15]Even if such a requirement were present, we think that the district court complied with it. We observe that in *Deck*, the Supreme Court took pains to assure the public that it did not "underestimate . . . the need to give trial courts latitude in making individualized security determinations." 544 U.S. at 632. The trial transcript indicates that an "individualized security determination" is precisely what took place in this case:

> [LARSON'S COUNSEL]:  I just wanted to ask permission if our clients could sit at counsel table with us so that we can consult with them.
>
> THE COURT:  Well, that is a matter that I'm going to leave to the discretion of the marshals for security purposes, and that will be their decision. And I have given them authorization to have these people placed where they think necessary for those reasons . . . . You need only turn around to talk to your client.
>
> [LARSON'S COUNSEL]:  They told me I had to ask you. They told me it was your order.
>
> THE COURT:  Well, if they have no objection, I don't. That's up to —
>
> DEPUTY MARSHAL:  I would prefer they stayed where they're at.
>
> THE COURT:  Marshal indicated he prefers the defendants stay where they are presently seated. That's where they will stay.

The judge relied on the informed, professional judgment of his deputy marshal and thereby clearly indicated that the only relevant concern involved in selecting this particular seating arrangement was courtroom security. *Cf. Norris v. Risley*, 878 F.2d 1178, 1182 (9th Cir. 1989) (explaining that a procedure is acceptable if it will be viewed only as a sign of a normal concern for safety and order). This constitutes a permissible exercise of discretion, notwithstanding Larson and Laverdure's attempt to malign the decision as "a rubber stamping of a request by law enforcement officers."

to a meaningful defense and competent counsel. *See Deck*, 544 U.S. at 631.

But there is no showing in the record that the seating arrangement interfered with the appellants' ability to communicate with their attorneys. Quite the contrary, the court explicitly informed the attorneys that they "need only turn around to talk to your client." Counsel for Laverdure acknowledged at argument that the appellants were seated directly behind the attorneys and that counsel and client had ready access to each other. *See United States v. Jones*, 766 F.2d 994, 1004 (6th Cir. 1985) (finding no violation of the right to consult with counsel because the defendants could pass notes to the attorneys and the attorneys could get up from counsel table to speak with their clients). Moreover, there is no suggestion that, like the practice of shackling, the court imposed any physical burden, pain, or restraint that confused or embarrassed Larson and Laverdure. *Deck*, 544 U.S. at 630-31.

**[21]** We are persuaded that the challenged seating arrangement was not inherently prejudicial, and Larson and Laverdure have not shown that they were actually prejudiced at trial. We therefore reject these constitutional claims.

V

Larson and Laverdure's final contention is that their trial suffered from cumulative error. *See, e.g.*, *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996)). Having discovered no error in Larson and Laverdure's trial, we reject this argument as well.

**AFFIRMED**.